**AMERICAN STANDARD, INC.,**
Plaintiff,

v.

**CRANE CO., Defendant and Third-Party Plaintiff,**

v.

**Edward J. HANLEY et al., Third-Party Defendants, and two other consolidated actions.**

No. 68 Civ. 2461.

United States District Court,
S. D. New York.

Oct. 12, 1971.

Supplemental Opinion July 6, 1972.

Sullivan & Cromwell, New York City, for plaintiff American Standard, Inc.; George C. Kern, Jr., Edward W. Keane, John L. Warden, Robert M. Osgood, New York City, of counsel.

Pomerantz, Levy, Haudek & Block, and Lord, Day & Lord, New York City, for defendant Crane Co.; Abraham L. Pomerantz, William E. Haudek, John W. Castles 3d, Michael J. Murphy, New York City, Louis Loss, Cambridge, Mass., of counsel.

Bobroff, Olonoff & Scharf, New York City, for Melvin Kritzler.

Wolf, Popper, Ross, Wolf & Jones, New York City, for Henry Abrams.

## OPINION

LASKER, District Judge.

In the spring of 1967 the fancy of Crane Co. ("Crane") lit upon Westinghouse Air Brake Co. ("Air Brake") as an attractive take-over candidate. As is often the case in corporate, as in amatory, affairs, the pursued was unwilling. Air Brake rejected its suitor and turned elsewhere for marriage and protection. American Standard, Inc. ("Standard") found Air Brake as appealing a partner as had Crane, competed for the favored hand and won. This litigation between the rejected and favored suitors—not the first battle between them on the subject —grows out of that courtship.

Standard sues under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("the Act") to recover short swing profits made by Crane in its dealings in the stock of Air Brake. The case presents the following questions:

1. Do the facts establish that an opportunity for speculative abuse by Crane existed?

2. If so, do Crane's dealings in Air Brake stock constitute sales (or purchases) within the meaning of the Act?

3. Did the Court of Appeals, in other litigation between the parties [Crane Company v. Westinghouse Air Brake Company, et al., and Crane Company v. American Standard, Inc. et al., 419 F.2d 787 (2d Cir. 1969)], determine that Standard's acts forced Crane to sell?

4. If so, does that finding prevent Standard from recovering from Crane on the theory of estoppel or otherwise?

## I.

On these cross-motions for summary judgment[1] as to liability, there are no genuine issues as to material facts, but the facts are complex and must be outlined in some detail for an intelligent understanding of the case.

In June 1967, Crane embarked on a program of buying Air Brake stock. In late 1967, Crane, not yet a 10% stockholder of Air Brake, proposed to Air Brake that it be merged into Crane. In December, Air Brake declined the proposal. Although Crane then briefly discontinued its purchases of Air Brake, it resumed them vigorously in January. By January 26, 1968, it held 463,000 shares, more than 10% of the 4,594,161 shares outstanding. On February 20, 1968, Crane filed 14–B statements with the Securities and Exchange Commission declaring its intention to solicit proxies to elect directors to Air Brake's board. This action sparked counter action by

1. Plaintiffs Henry Abrams and Melvin Kritzler (in the two actions consolidated herewith), former stockholders of Air Brake, have submitted a memorandum and affidavits in opposition to Crane's motion and in support of Standard's. As an alternate position they argue that, even if the court holds, for reasons to be discussed later, that Standard is estopped from recovering from Crane, Crane should nevertheless be held liable to the former stockholders of Air Brake.

Air Brake in the form of discussions with Standard as to a merger of Air Brake into Standard. On March 4, 1968, the president of Standard advised Crane's chairman that agreement had been reached on a Standard-Air Brake merger, and the following day the announcement was made to the public.

Although Crane's chairman remarked at the time [2] that such a merger would cause Crane to become a stockholder of Standard, which "looked like an impossible situation," Crane decided to fight it out with Standard and continued its program of buying Air Brake stock. On April 6, 1968, Crane publicly announced its tender offer for all the outstanding stock of Air Brake.

Crane's tender offer to exchange a package of its stock and debentures totaling $50 in face amount for a share of Air Brake was mailed during the week of April 8. Through its tender offer Crane secured over 500,000 Air Brake shares in April and more than 250,000 within the following month, so that it finally owned 32% of the stock. By its terms the offer expired April 19 at 5:00 P.M. On April 10, Air Brake was selling at about $49.

On the day that the Crane tender was to expire, Standard purchased 170,000 shares of Air Brake on the New York Stock Exchange at an average price of $49.50, and on the same day sold 100,000 shares off the market and 20,000 shares on the market at a negotiated average price of $44.50 for a loss of over $500,000 on its transactions for the day. The Court of Appeals of this Circuit has described Standard's April 19th activities and their result as follows:

"The critical day in the take-over battle was April 19, the day Crane's tender offer for Air Brake stock was to expire. The holders of Air Brake stock could be expected to delay until the last moment in order to make a decision based on the latest market information, i. e., to compare the value of the tender offer, here not more than $50, with the market price on the day the offer was to expire. In fact, 85 percent of the shares tendered to Crane by the 19th were offered on that day. [citation] On April 19, Air Brake opened at 45¼ on the New York Stock Exchange, giving Crane's tender offer a good prospect of success. The surest way to defeat the Crane offer was to run the price up to $50. The tape did quickly reach $50 on April 19, and Crane's tender offer failed. Crane's claim that this was the result of extraordinary transactions by Standard is supported by the record.

". . . The net result of this buying was to represent to the public, whose primary source of information is the tape, that there was a great demand for Air Brake at an increased value. It is reasonable to conclude that many Air Brake stockholders who might otherwise have chosen to tender to Crane chose not to do so because their own holdings in Air Brake looked better as the price went up.

". . . Standard had 'painted the tape' in Air Brake stock. . . .

"Standard's extraordinary buying here, coupled wih its large secret sales off the market, inevitably distorted the market picture and deceived public investors, particularly the Air Brake shareholders." Crane Company v. Westinghouse Air Brake Company, et al., 419 F.2d 787, 792–793 (2d Cir. 1969).

On or about May 16, 1968, the Air Brake stockholders voted to approve the merger with Standard. On June 7 the merger became effective and the Standard preference stock was exchanged for Air Brake common. Between June 7 and June 13, Crane exchanged its then holdings of 1,480,623 Air Brake shares for 740,311 of Standard, and on June 13 sold 730,311 shares of Standard on the New York Stock Exchange for $76,134,-921.75 at a profit estimated at over $10,-

---

2. Deposition of Thomas M. Evans, May 10, 1968, p. 32, in Crane Co. v. Westinghouse Air Brake Company, et al., 68 Civ. 1560.

000,000. Shortly thereafter Crane sold 9,000 of its remaining 10,000 shares.

In late May, prior to the consummation of the merger, Crane had brought two suits against Air Brake and Standard, the first to enjoin the merger, the second—with which we are concerned in this case and to which reference has been made above—charging Standard with manipulation in violation of the Securities Exchange Act of 1934. The first suit, as is evident from the fact that the merger was consummated, was dismissed on June 5 after trial. The second—the case on the basis of which Crane moves here for summary judgment—was also dismissed on June 5, but that dismissal was reversed by the Court of Appeals in the opinion quoted above. The Court there held:

> "Standard's actions had the intended and inevitable effect of inducing Crane to become a seller within the meaning of section 9(a) (2), for if successful in defeating Crane's tender offer and consummating the Standard merger, antitrust considerations would require sale by Crane of the shares held by Crane or those received in exchange. This placed Crane in a situation comparative to that of the dissenting shareholders in Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967), cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1968) for here, as there, plaintiff was forced to become 'a seller under the Act.'" Crane Company v. Westinghouse Air Brake Company, supra, 419 F.2d at 794.

And further, at 795–796:

> "Standard's failure to disclose its manipulation operated as a fraud or deceit on Crane in connection with the purchase and sale of securities, creating a right to relief in Crane quite apart from Crane's rights as a forced seller under section 9(a) (2)."

and at 798:

> "The success of Standard's maneuver made Crane a forced seller of the newly issued Standard convertible prefer-

red under threat of a divestiture action to be brought by Standard under the antitrust laws."

The Court remanded the case for a determination of the appropriate remedies, observing, at 803–804:

> "The manipulation may be found to have deprived Crane of success in its tender offer in the free market to which it was entitled . . ."

## II.

In support of its motion for summary judgment, Crane argues (1) that the Court of Appeals has established that the transactions which form the basis of the instant suit were forced on Crane by Standard's illegal manipulation and deception, (2) that the Court of Appeals' decision collaterally estops Standard from recovery here, and (3) that an illegally forced transaction is not a "purchase" or "sale" within the meaning of § 16(b).

In opposition, Standard contends that § 16(b) applies on its face to Crane's transactions (there is no dispute that Crane was an "insider" under the section and that its transactions in Air Brake occurred within a period of six months), and that Crane's theory that "an illegally forced transaction" is not subject to § 16(b) is incorrect as a matter of law. At the least, Standard asserts, Crane is not entitled to summary judgment because, it claims, there are disputed questions of material fact as to the alleged "forced sale."

In the light of these contentions we proceed to treat the issues which they generate.

## III.

A. *Were there opportunities for speculative abuse?*

Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78p(b)) provides:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason

of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months.[3]

Its purposes and effects have been analyzed in a number of significant opinions, most recently in the succinct statement of Judge Kaufman writing for the Court of Appeals of this Circuit in Newmark v. RKO General, Inc. and Frontier Airlines, Inc., 425 F.2d 348, 350–351 (1970):

> "Commonly termed a 'crude rule of thumb,' the statute seeks to prevent insiders from realizing profits on securities held for short periods of time. It is not aimed solely at the actuality of evil, or the veritable employment of inside information for purely speculative purposes, but also at *potentiality* for evil inherent in all insider short-swing trading." (emphasis added).

> "To maximize its deterrent effect, the section is drafted in clear, straightforward terms. It provides that whenever a director, officer or owner of ten percent or more of any class of an issuer's securities purchases and sells equity securities of that issuer within a six-month period, he must return any profits he realizes to the issuer. There are no other prerequisites or postulates to liability."

The comprehensive reach of the § 16 (b) tabu was earlier characterized by the Court of Appeals as follows:

"In order to insure discouragement of unfair insider short term trading *all* inside trading within a less-than-six-month period is discouraged. The arbitrary, some might say Draconian, nature of this statute reflects the view of experts who testified at the hearings leading to the passage of the 1934 Act that the use of information by corporate insiders could only be effectively curbed by a law that made it unprofitable for insiders to engage in any short term trading, whether fair or unfair. It might be said that Congress decided in order to throw out the bathwater that the baby had to go too." (emphasis in original). Blau v. Lamb, 363 F.2d 507, 515 (2d Cir. 1966).

In spite of the breadth of this construction of § 16(b) and a reiteration of earlier holdings that the section applied to conversions of securities as well as to cash transactions, the Court nevertheless raised the important question whether § 16(b) could be held to apply to a "transaction . . . which could not possibly serve as a vehicle for any of the abuses at which Section 16(b) was aimed." The answer was that it could not, and this construction necessarily required a preliminary inquiry as to whether the accused transaction could "possibly" fall within the guilty category. On this point the *Blau* court observed, at 519:

> "Congress adopted the sweeping, arbitrary regulatory mechanism embodied in Section 16(b) in order to insure that even the *possibility* of insider abuse was deterred, but it would seem to follow that in order to avoid 'purposeless harshness' a court should first inquire whether a given transaction could *possibly* tend to accomplish the practices Section 16(b) was designed to prevent. . . . Frequently this initial inquiry will convince a court that the transaction in question held out at least the possibility of abuse;

---

3. The section applies to "every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security . . . " registered pursuant to the Act.

in such cases Section 16(b)'s regulatory mechanism requires that the section be applied without further inquiry. In some cases, however, this critical inquiry will convince a court that the conversion transaction in question could not possibly have lent itself to insider abuse. In such a case it is not inconsistent with Section 16(b)'s regulatory mechanism to hold that the section does not apply." (emphasis added).

The requirement of a threshold determination was reiterated in Newmark v. RKO General, Inc., supra, 425 F.2d at 351:

"Only when an opportunity for speculative abuse is present is it necessary to determine whether the transactions alleged to give rise to 16(b) liability may fairly be characterized as insider purchases and sales."

We turn, therefore, to the preliminary but decisive question of whether an opportunity for speculative abuse inhered in Crane's transactions in Air Brake stock.

It is natural that Crane contends that no possibility for speculative abuse existed in the unique set of facts before us. The heart of Crane's argument is that Crane was not only a forced seller, but that, in the circumstances, and particularly in light of Standard's unexpected manipulative acts of April 19, it had no power to determine whether the merger would take place, and, the merger being forced on it, there was no possibility for Crane to speculate. In order to engage in short term speculation, Crane asserts, the trader must have the power to decide whether and when to buy or sell.

In answer, Standard asserts: Since nearly all merger announcements bring about a rise in the market price of a merging company, Crane stood to win, and knew it stood to win, whether or not it acquired control of Air Brake; if it succeeded in the control battle, it gained a major business objective; if it did not, it would make exactly the kind of insider profit that § 16(b) outlaws. The exchange ratio, Standard argues, when publicly announced (as it inevitably would be) would have a predictably beneficial effect on the price of Air Brake stock. Crane knew prior to March 4 that this would occur and was in a position to exploit the knowledge. Thus it had precisely the unfair trading advantage vis-a-vis unknowing members of the general public which the section condemns. This is Standard's riposte to the transactions involving the Air Brake shares which Crane acquired before April 19.

As to the shares purchased by Crane after that critical date (491,861 shares, purchased part on April 29, May 14 and May 24, at a cost of over $24,000,000), Standard contends that Crane's argument that Standard's acts put beyond Crane's power the determination whether the merger would take place is altogether inapplicable or, if it is applicable, then the only reason Crane could have for buying after April 19 was pure speculation.

■ We hold that opportunities for speculative abuse did inhere in Crane's transactions. We start from the statutory presumption, emphasized in Chemical Fund, Inc. v. Xerox Corporation, 377 F.2d 107, 110 (2d Cir. 1967), that

". . . section 16 is specifically concerned with 'directors, officers and principal stockholders,' and has adopted a rule that any stockholder owning more than 10 percent of an equity security is presumed to be an insider who will receive information regarding the company before it is made public."

Of course, the rule states only a presumption, but the presumption is supported, not rebutted, by the facts here. The record establishes that, in spite of the rejection by Air Brake of its original merger proposal, Crane voluntarily thereafter acquired the status of a 10% holder; that it was informed on March 4 of the proposed Air Brake-Standard merger and its ranking officer remarked that for Crane to be a stockholder of Standard would be an "impossible situa-

tion"; that nevertheless Crane thereafter issued its tender offer, and that even after Standard's unexpected manipulative acts of April 19 it purchased over 490,000 shares of Air Brake—with the knowledge that either Standard would win the fight and Crane would be "forced" to sell, or that it might reap a speculative harvest on the almost certain (and ultimately actual) rise in the price.

To describe these facts and events it is not necessary to hold—and no holding is made—that Crane's acquisition of Air Brake stock was either illegal or unethical. But the recital does lead to the conclusion of *possibilities* of speculative abuse inherent in the situation. We are entitled, of course, to take into consideration not only the facts, but the reasonable inferences which may be drawn from them. A realistic estimate of the inferences consequent to such facts is found in the statement of the then chairman of the Securities and Exchange Commission in Hearings Before the House Committee on Interstate and Foreign Commerce, 90th Cong., 2d Sess. (on H.R. 14475 and S. 510, at p. 22, July 1, 1968):

> "There has been enough experience in the past 2 years for any sophisticated takeover bidder to know that, unless management joins him, management will seek another partner and that other partner probably will make a slightly better offer. We have the feeling that many of these people are doing it for the short-term gain, or, to use the vernacular, to make a fast buck. We have a number of variants of that. We have a situation where almost overnight [a] particular individual or company made several millions of dollars in a situation of this kind.
>
> "We have the feeling that some of these offers are made only to initiate that activity."

We find support for our view of the matter in the decision of the Court of Appeals of this Circuit in Newmark v. RKO General, Inc., supra. That suit involved a merger between Frontier Airlines, Inc. and Central Airlines, Inc.

RKO controlled Frontier during the times in question. After provisional agreement had been reached as to merger of the airlines (but before public announcement or stockholder approval) RKO contracted to buy 49% of Central's outstanding shares and $500,000 of its convertible debentures. The merger agreement provided for the exchange of Central for Frontier common. RKO exercised various rights of control as majority holder of Frontier and a controlling stockholder of Central. In addition, RKO had an option to cancel in the event that the subsidy awarded by the CAB to the surviving airline was inadequate in RKO's "good faith judgment." The merger agreement was approved by the stockholders, by the CAB and creditors. RKO then consummated its purchase of Central securities. The merger agreement was filed and Central's securities were exchanged for Frontier's. The District Court held that the conversion rendered RKO liable under § 16(b). In affirming, the Court of Appeals remarked at the outset:

> "That RKO's heart may have been pure and its motivation noble matters not. The significant factor is whether RKO *could have* reaped a speculative profit from the 'unfair use of information * * * obtained * * * by reason of [its] relationship to [Central].'" (Emphasis in original). 425 F.2d at 353.

The Court's answer was affirmative. It is true that the Court—properly—placed emphasis on the facts that RKO controlled Frontier, had knowledge of the merger, and had a contract right to cancel the agreement, and that its option to purchase Central securities at a fixed price put it in ideal position to profit from an anticipated rise in the price of the stock—facts not present in the instant case. However, exceptional as such facts are, at least in combination, they were not elements sine qua non to the finding. Rather, they merely underpinned, although emphatically, the oppor-

tunity for speculative abuse which there existed.

Here Crane, although it did not possess the array of control powers exercisable by RKO, nevertheless knew that the probabilities were, from the time of Air Brake's rejection onward, that Air Brake would "seek another partner and that other partner" would "probably . . . make a slightly better offer." After March 4 it knew this to a certainty and, although it quite rightly points out that it could not have anticipated Standard's manipulation of April 19, it nevertheless purchased over 490,000 shares of Air Brake in a period of more than a month thereafter.

Furthermore, aside from the fact that any party in Crane's position could reasonably have inferred from the dynamic pattern of take-over fights that it would either win control or be in a strong position to sell at a profit, there were also significant ways in which Crane could influence the course of events. For example, it could easily affect the exchange ratio of the merger by the terms of its own tender offer. It controlled the timing of its offer and had the opportunity to improve it with resultant effect on the ultimate terms of merger between Air Brake and Standard. Such power fits within the District Court's rationale in *Newmark* (294 F.Supp. 358, 365 (S.D.N.Y.1968)) that an insider who "could influence the speed and timing of the merger, and possibly its outcome" may be liable under § 16(b). It must constantly be remembered that our search is not to determine whether Crane intended these results, but whether they were possibilities which inhered in the situation. We hold that they did, ard that § 16(b) is applicable if Crane's transactions constituted purchases and sales within the meaning of the section.

**B.** *Were there purchases and sales?*

No elaborate analysis is necessary to answer this question. Without determining at this point whether, as Crane argues, Standard's acts "forced" Crane to sell so that Standard cannot recover, there can be no doubt that Crane's transactions were purchases and sales which would ordinarily be covered by § 16(b). Crane does not dispute that its acquisitions of Air Brake stock were purchases, and consequently we need to consider only (1) whether the conversion of Crane's Air Brake stock constituted either a purchase of Standard stock or sale of Air Brake, and (2) whether under any circumstances Crane's sale for cash of Standard stock was not a sale of stock purchased within six months.

In Blau v. Lamb, supra, it was held that the conversion of preferred for common stock of the same company was not a sale under § 16(b). But the doctrine of "economic equivalence" formulated there is applicable only to the exchange of securities of a single issuer, a case not before us. To the contrary, "sales or purchases [as here] by an insider of his issuer's securities for cash, *the securities of a different company,* or other property are within the reach of Section 16(b) . . ." Blau v. Lamb, 363 F.2d at 523, as quoted in Newmark v. RKO, supra, 425 F.2d at 354. (Emphasis added in *Newmark*).

The question of whether conversion of Crane's Air Brake stock constituted a sale of Air Brake or purchase of Standard is decided by the rationale of *Blau,* and the specific ruling of *Newmark* which held that the conversion of RKO-held securities constituted a sale within the meaning of the section. Accordingly, we hold that the conversion of Crane's Air Brake stock into Standard stock constituted a sale of Air Brake to be matched against its cash purchases of that stock within a period of six months prior to the date of conversion.

## IV.

*The Effect of the Court of Appeals' Decision in Crane v. American Standard*

### A. *The question of forced sale*

We have earlier reviewed the history of the litigation commenced by Crane against Standard growing out of Stand-

ard's acts of April 19, and have recited the Court's observation that Standard's behavior "placed Crane in a situation comparative to that of the dissenting shareholders in Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967, cert. denied 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1968) for here, as there, plaintiff was forced to become 'a seller under the Act.'" (419 F.2d at 794). Crane strenuously argues that, even if it is determined that § 16(b) is applicable to its transactions—that is, that an opportunity for speculative abuse was inherent in those transactions, and they constituted purchases and sales within six months—nevertheless the holding of the Court of Appeals in Crane v. American Standard estops Standard from recovery.

■ It is contended that the Court of Appeals "found" Crane to have been a forced seller in the precise circumstances at hand, and that, under the doctrine of collateral estoppel, this finding binds Standard and precludes it from prevailing. Crane adds that the equitable doctrine preventing a wrongdoer from profiting from his own wrong stands as a further bar. At first blush there is great appeal in this rationale. For if it is true that the Court of Appeals has already found that Standard's illegal acts forced Crane to sell, then to allow recovery by the very party that forced the sale appears harsh. But there are a number of reasons why the rationale is not sound and the defense fails.

In the first place, in spite of the words used, there is some doubt whether the Court of Appeals "found" Standard's acts to have caused Crane to become a forced seller—at least if the word "found" is intended to mean "found as a fact," which it must to invoke the theory of collateral estoppel. The first such doubt is raised by other words in the opinion itself. For, in spite of the apparently unconditional language quoted above, the Court at the conclusion of its opinion seems to have qualified its determination. Thus, in remanding the case to the District Court, the Court states:

> "The manipulation *may* be found to have deprived Crane of success in its tender offer in the free market to which it was entitled. . ." (emphasis added).

Aside from the fact that Crane itself, in its petition (in Crane v. American Standard) for certiorari to the United States Supreme Court, argued that a more positive ruling by that Court would eliminate the "need" on remand "for proof that the manipulation deprived Crane of success in its tender offer" (Crane petition, June 2, 1970, p. 17), the remand language of the Court of Appeals surely diminishes the claim that that Court "found" Standard's acts unconditionally to have caused Crane to become a forced seller.

This construction of the Court of Appeals opinion is supported by the decision of Judge Mansfield, on remand, in Crane Co. v. American Standard, Inc., 326 F.Supp. 766 (S.D.N.Y.1971). There Crane had argued that on the record it was entitled to summary judgment. In deciding that it was not, and that the question of damages must constitutionally be tried by jury because there remained issues of material fact, Judge Mansfield reviewed the history of the litigation. He emphasized that the Court of Appeals had noted that Judge Ryan on trial " 'denied relief with no extensive treatment of the market manipulation and fraud claims involving sections 9(a) (2) and 10(b) of the Act . . .' " Judge Mansfield then commented as to the Court of Appeals opinion (326 F.Supp. at 774):

> "Faced with a decision containing such summary findings on the market manipulation claims, the Court of Appeals indicated clearly in Judge Smith's opinion that, for purposes of equity *jurisdiction*, it would have reached the contrary conclusion and found the essential elements of a violation of § 9(a) (2) and § 10(b) on the basis of Standard's buying huge amounts of Air Brake stock at $50 in

the open market and on the same day making substantial off-market sales at about $44 to friendly institutional investors. This language should not be construed, however, to read that as a matter of law no reasonable jury could have found that Standard had not violated the above sections of the securities laws." (emphasis added). \* \* In the absence of specific findings by Judge Ryan with respect to the claims based on §§ 9(a) (2) and 10(b), which would have been upset only if found by the Court of Appeals to be 'clearly erroneous,' Rule 52(a), F.R.Civ.P., the Court of Appeals concluded that on the record before it, it would have inferred the requisite motive and intent 'from the circumstances of the case,' 419 F.2d 794. This is a far cry from finding that as a matter of law motive, intent and willfulness *must* be found on this record or that it would reject a jury finding to the contrary." (emphasis in original).

And later (at 776):

"As we view it the Court of Appeals did not hold that a jury, after observing the witnesses and appraising their credibility, would be precluded from deciding issues of intent, motive and willfulness *contrary to the inferences drawn by it,* for the purposes of equitable relief, without benefit of such personal observation of the witnesses." (emphasis added).

## B. *The Estoppel Defense*

■ Assuming, arguendo, nevertheless, that the Court of Appeals decision is properly construed as "finding" Crane to be a forced seller, the defense still must fail.

In the first place, the issue in Crane v. American Standard was not the same as here. There the court was called on to determine whether Crane had *standing* as a seller under §§ 9(a) (2) and 10(b) of the Act, sections of the statute with which we are not concerned here. In analogizing Crane to the forced seller in Vine v. Beneficial Finance Co., the Court of Appeals made it clear that it viewed Crane as having standing to sue for damages resulting from manipulative acts directed against it. Such a holding, however, is no determination of the quite different question whether Crane was a "forced seller" under § 16 (b), or whether, if its status resulted from Standard's acts, that status or those acts would preclude recovery of Crane's short swing profits in Air Brake.

Second, assuming that, under the rule of *Newmark* and the holding above in this case, the conversion of Crane's Air Brake stock into Standard stock is the event which constituted a sale by Crane, then Standard's acts did not cause, much less force, the sale within the meaning of § 16(b). If causation be measured, as it classically is in analogous situations, by a "but for" test, it cannot be said that the conversion would not have occurred "but for" Standard's acts, since a conversion could (and probably would) have occurred just as well whether Standard won the battle without manipulation, or even perhaps (though it need not be decided), if Crane had won.

Third, if the sale be regarded as taking place when Crane actually sold its Standard stock for cash, there is no showing (nor any holding by the Court of Appeals) that Standard's acts forced Crane to sell *when it did*—that is, either within six months of its original acquisition of the stock or within six months of the conversion. If Crane had held for the longer of these periods it could not be liable under any theory. While it is argued—and the Court of Appeals approved the argument—that Crane, as a chief competitor of Standard, would be forced to sell its Standard stock to avoid the impact of the antitrust laws, there is no evidence whatever to support the inference that that sale had to be made within six months. It is equally reasonable to infer either that Crane could have held the government at bay for six months or accepted a decree or arrangement which permitted the sale of its stock after that period expired. In any event, and without hypothesizing whether such possibilities were real, there is a

fatal deficiency of evidence that the *timing* of the sale—a critical element—was caused by Standard's acts or that the Court of Appeals found that it was.

Up to now we have discussed the elements of collateral estoppel. It may be added that, in view of the therapeutic aims of § 16(b), the courts do not favor the defense of equitable estoppel, also relied on by Crane, in § 16(b) cases. See, e. g., Magida v. Continental Can Company, 231 F.2d 843 (2d Cir. 1956), cert. den. 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956); Abrams v. Occidental Petroleum Corporation, 323 F. Supp. 570, 582 (S.D.N.Y.1971); Volk v. Zlotoff, 285 F.Supp. 650, 655–656 (S.D. N.Y.1968); Jefferson Lake Sulphur Co. v. Walet, 104 F.Supp. 20 (E.D.La.1952), aff'd 202 F.2d 433 (5th Cir. 1953), cert. den. 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346 (1953).

We conclude, therefore, that Crane's defense based on the Court of Appeals decision in Crane v. American Standard is ineffective here; that Crane is liable under § 16(b), and that Standard is not estopped from recovering such damages as it may prove.

This conclusion is consistent with other decisions in which recovery has been allowed against "forced" sellers of sorts. In Western Auto Supply Company v. Gamble-Skogmo, Inc., 348 F.2d 736 (8th Cir. 1965), the Court upheld recovery of short swing profits under § 16(b) even though the sale which produced the profits was required by a consent anti-trust decree. The defendant argued that, because its action was "compelled by the Government's antitrust action," § 16(b) should not apply. The Court brushed aside the contention, remarking: "In any event, the mere pendency of an action would not weigh to give the term 'sale' any other than its ordinary meaning." *Id.* at 742. The case is directly in point here, for if the *actual* pendency of antitrust litigation is not construed as removing a resultant sale from the coverage of § 16(b), surely the mere possibility of such litigation, as here, is not effective to do so.

Alloys Unlimited, Inc. v. Gilbert, 319 F.Supp. 617 (S.D.N.Y.1970), held that recovery was proper under § 16(b), even though the sale of securities which had been pledged as collateral was not made by the defendant (owner of the stock) but by the bank-pledgee. The defendant argued that the liquidation of the stock was not a "sale" within § 16(b) since it was involuntary on his part and did not represent the type of speculation against which § 16(b) was directed. Judge Mansfield rejected that view, holding that the transaction was one which permitted the opportunity for speculative abuse, since a trader could bring about such a sale deliberately by defaulting on the underlying loan.

In Abrams v. Occidental Petroleum Corporation, supra, 323 F.Supp. 570, a case having many elements in common with the instant action, the defendant (Occidental), as here, acquired stock in a company it sought to take over. Occidental, like Crane, was unsuccessful in the take-over battle, and upon merger of the target company with Occidental's rival, Occidental received, for its target company stock, stock in the merged company, which it sold. Occidental "sought from the SEC a new rule, Rule 16(b)–11" which would have exempted the transaction from the operation of § 16 (b). The SEC declined to issue the rule. In the court proceedings Occidental argued that its acquisition of the merged company's stock was "involuntary," but Judge Palmieri rejected the contention and found Occidental liable under the section.

Our conclusion reaches a proper result. It leaves each party free to proceed with whatever rights it has against the other. As nothing in the rulings of the other courts in Crane v. American Standard prevents such recovery as is warranted here, so nothing in this opinion stands as a barrier to Crane's rights in other litigation against Standard. Each company's ultimate recovery will be determined, as it should be, on the merits of its respective claim and the particular

section of the Act under which it is brought.

■ To conclude: The motion of Crane Co. for summary judgment against American Standard, Inc. is denied. The motion of American Standard, Inc. for summary judgment against Crane Co. as to liability is granted.

It is so ordered.

## SUPPLEMENTAL OPINION

On October 12, 1971, we issued an opinion (CCH Fed.Sec.L.Rep. ¶ 93,237) granting Standard's cross-motion and denying Crane's motion for summary judgment in this action for the recovery of short-swing profits under § 16(b) of the Securities Exchange Act of 1934. On the following day the Court of Appeals of this Circuit decided Abrams v. Occidental Petroleum Corp., 2d Cir., 450 F.2d 157. Because the *Occidental* court summarily dismissed the complaint on a record which bore marked similarities to the case here, our opinion of October 12 was withdrawn to permit consideration of the possible impact of *Occidental* on the issues before us.

Although we expressly limited the scope of supplemental briefs to the impact of the *Occidental* case, Crane nevertheless has raised several new issues which, even construing our instructions most liberally, have no relation to the Second Circuit's decision. However, in the interests of judicial economy, we accept the responsibility for determining what amounts to a new motion for summary judgment.

We conclude that *Occidental* does not bar our earlier disposition of the case and that the further grounds newly pressed by Crane are without merit.

*The Impact of Occidental*

Our earlier opinion devoted itself to the following questions:

1. Whether the facts established that an opportunity for speculative abuse by Crane existed.

2. If so, whether Crane's dealings in Air Brake and Standard stock constituted purchases and sales within the meaning of the Act.

3. If so, whether the decision in Crane v. Westinghouse Air Brake Company, 419 F.2d 787, 792–799 (2d Cir. 1969), constituted a binding determination that the merger resulted from Standard's illegal market manipulation.

We answered the first two questions in the affirmative and the third in the negative.

Since *Occidental* related in no way to the third issue listed above, there is no need to reconsider the validity of our decision on that point, and indeed, for purposes of the present argument, Crane accepts the ruling without agreeing to it.

There remains for determination the effect of *Occidental* on our decision that the facts here presented Crane with an opportunity for speculative abuse and that Crane's dealings in the Air Brake-Standard stocks constituted purchases and sales within the meaning of the Act.

A brief sketch of *Occidental* is in order. There, as here, the claims were asserted on behalf of what we described in our earlier opinion as the successful suitor of a target corporation against the unsuccessful suitor.[1] New Kern was the happy winner; Occidental the sad loser. They stand as counterparts of Standard and Crane in this case.

Occidental made the first tender offer for the target corporation, Old Kern.

---

1. Kern County Land Company (Old Kern) was the target corporation in the *Occidental* case. Occidental's rival for the take-over of Old Kern was Tenneco, Inc. The agreement ultimately reached between Tenneco and Old Kern provided that, in exchange for the transfer of Old Kern's assets to a newly organized wholly-owned subsidiary of Tenneco known as New Kern, each share of Old Kern would be exchanged for a share of preference voting stock of Tenneco convertible into shares of its common stock. For the purpose of simplicity, we refer to New Kern in all instances in which the corporation actually referred to might be either New Kern or Tenneco.

In a pattern which seems all but inevitable in such matters and is for all practical purposes identical to the rivalry here between Standard and Crane for the control of Westinghouse Air Brake, Old Kern resisted Occidental and ultimately reached agreement with New Kern.[2] As in our case, the unsuccessful competitor—Occidental—had become a 10% stockholder of the target corporation, and (as here, too) its holdings irrevocably entitled it to shares of the successful competitor—New Kern—by virtue of the merger agreement between the target and New Kern. The *Occidental* scenario, however, included an embellishment not found in our script: While the merger plan was being formulated, Occidental entered into an agreement with its competitor granting the latter an assignable option to buy the stock Occidental would receive as a result of the merger.

The merger was consummated and in due course, on December 11, 1967,[3] Occidental tendered its Old Kern stock for the exchange stock, New Kern's assignee exercised its option to buy, and Occidental sold the stock at a substantial profit over its investment. The § 16(b) suit followed.

New Kern sought judgment on two grounds: First, that Occidental had "sold" its Old Kern shares when it became irrevocably entitled on August 30, 1969 to the exchange stock, and second, that the option agreement of June 2, 1967 constituted a "sale" by Occidental of the Old Kern shares that had been or would thereafter be acquired. The Court of Appeals rejected both contentions and dismissed the complaint. As to the first argument, the court extended to the receipt of exchange stock of *another* company (in a merger) the test of Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. den. 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed. 2d 542 (1967), as to the conversion of stocks of *one* company, i. e., that in de-

termining whether a conversion constituted a purchase or sale the court "would look to the question whether the conversion could have lent itself to speculative abuse." As the opinion stated:

"We see no reason why this same principle should not apply when the question is whether the receipt of securities of another company, in a transaction which the 'insider' did not arrange and in which all stockholders were entitled, indeed here were forced, to participate, constitutes a 'sale.'" *Occidental*, supra, 450 F.2d at 162.

As to the second (option) claim, the court applied its "established rule" that the mere grant of an option to purchase is not a sale for purposes of § 16(b).

We are primarily concerned with *Occidental's* ruling that no opportunity for speculative abuse inhered in that case, and turn to a further analysis of the opinion on that point.

The key to the court's holding lies in its distinction between the facts in Newmark v. RKO General, Inc., 425 F.2d 348 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970), and those presented in *Occidental* itself. In *Newmark*—relied on both by the plaintiffs in *Occidental* and by Standard here—the court had found § 16(b) liability resulting from the merger-triggered conversion of securities. The *Occidental* court found compelling differences between *Occidental* and *Newmark*. The telling language, for our purposes, follows:

"While the *RKO General* decision does assist appellees to the extent of its holding that an exchange pursuant to a merger *may be* a 'sale,' the indispensable predicate to the holding that the particular exchange there at issue was within § 16(b) was the finding that RKO's knowledge of the impending merger coupled with the ability to control it involved the possibility of speculative abuse with which § 16

2. See footnote 1 above.

3. Occidental had become a 10% stockholder of Old Kern by May 4, 1967, and its last

purchases of Old Kern stock appear to have occurred before June 8.

(b) meant to deal. (emphasis in original).

"Appellees have failed to demonstrate any counterpart of this with respect to Occidental. It is urged that Occidental possessed the 'inside information' that Old Kern might well respond by arranging a 'defensive merger' and that, if the terms were sufficiently favorable, Occidental would not try to top them. But, in contrast to *RKO General* where the buyer knew of the imminent announcement of a merger that would enhance the price of the shares and could largely control its course, Occidental had no knowledge what Old Kern would do, and certainly did not know that Old Kern would be able to arrange an exchange offer exceeding Occidental's bid by $20 per share, with the added benefit of freedom from capital gains tax. We fail to see the possibility of speculative abuse in a situation where such an offeror simply declines to make a still higher offer or to attempt to block a transaction which it regards as advantageous to all the stockholders including itself." 450 F.2d at 163.

If the case at hand turned solely on the question whether Crane's position offered the opportunity for speculative abuse, the *Occidental* court's rationale might well raise serious doubts as to whether Standard's motion for summary judgment could be granted, although it is far from clear that Crane did not have "the ability to control" characteristic of "Newmark" vulnerability to § 16 (b). We need not wander through the thickets of an extended analysis on that point, however, because a compelling difference exists between *Occidental* and the case before us: that is, that all of Occidental's cash purchases and its subsequent cash sales occurred more than six months apart (June 8—December 11), whereas Crane's acquisition and disposition of its shares *for cash* occurred within five months (January 25—June 7) of its becoming a 10% stockholder of Air Brake. Indeed, the *Occidental* plaintiffs made no claim based on Occidental's

*cash* sales (because they occurred beyond the six-months statutory period), but complained rather that Occidental's receipt of the exchange stock on merger and its execution of a "call" option were "sales" as a matter of law. Standard's complaint against Crane, on the contrary, *is* based (Par. 9) on Crane's cash sales, matched against its acquisition of the Air Brake common.

Accordingly, rather than falling in the "uncovered" category carved out by Occidental, Crane's purchases and ultimate cash sales constituted what Chief Judge Friendly characterized as

" . . . a garden-variety purchase and sale . . . within six months, the situation(s) to which Congress' attention was primarily addressed when it enacted § 16(b) . . . The only way to avoid § 16(b) liability in such cases is to see to it that the matching transaction is postponed beyond the six months period, although one day is enough to do the trick." *Occidental,* supra, 450 F.2d at 162.

It is true that in our earlier opinion we placed stress on the issue of speculative abuse: because the parties themselves posited in the alternative the question posited in *Newmark* (and later in *Occidental*)—whether Crane's acquisition of the exchange shares through the merger constituted a "sale." For the purposes of ruling on that alternate theory it was necessary to analyze at length Crane's opportunity for speculative abuse.

However, we also pointed out in our earlier opinion that one of the two questions before us was "whether under any circumstances Crane's sale for cash of Standard stock was not a sale of stock purchased within six months" (p. 1161 of opinion), and we concluded, in answer to Crane's assertion that its cash sale was "forced" by Standard, that ". . . if the sale be regarded as taking place when Crane actually sold its Standard stock for cash, there is no showing (nor any holding by the Court of Appeals) that Standard's acts forced Crane to sell *when*

*it did*—that is, either within six months of its original acquisition of the stock or within six months of the conversion." (p. 1163 of opinion).

Our use of the conditional phrase "if the sale be regarded as taking place when Crane actually sold its Standard stock for cash" did not imply any doubt that the cash sale was a critical event as a matter of law, but only that Standard argued the alternate theories of a sale on conversion as well as a cash sale. There could, of course, never have been a doubt that the cash sale was a "sale." The only question raised *as to the cash sale* was whether it was "forced" by Standard. We have ruled that it was not, and, as we have stated above, *Occidental* does not affect that ruling.

Accordingly, we find that the holding in *Occidental* requires no change in our earlier opinion, which we now reaffirm.

We proceed to the issues raised by Crane's new motion for summary judgment.

### The New Motion

Crane's new motion is based on the contention that its sale of the Standard preference stock it received in the merger cannot subject it to § 16(b) liability because during the six-day period between the merger and its sell-out the stock was temporarily an "exempted se-

curity" and because it was not effectively registered under § 12 of the Exchange Act.

Standard claims that these contentions are erroneous as a matter of law. Nevertheless, it argues that it is altogether irrelevant whether the Standard *preference* stock was exempt or nonregistered because the preference was convertible into Standard *common* stock which was admittedly registered and nonexempt.

Although we agree with Standard that Crane's argument as to the exempt status of the preference stock is incorrect, we need not treat that contention at length, since we also find merit in Standard's second point—that the status of the preference stock as to exemption or registration is irrelevant. It is appropriate to comment, however, that we find Crane's "exemption argument," relying as it does on technical rules of the Securities and Exchange Commission (which regulate the mechanics of trading on the Stock Exchange) to cull out a general exemption from § 16 (b), highly questionable.[4] For example, Rule 12b–6,[5] which Crane contends establishes an exemption, in fact merely specifies the date on which a registration statement is to be deemed effective; it does not create an exempted security, as defined by § 3(a) (12) of the Act. Again, Rule 12a–5 [6] is solely intended

---

4. In *Occidental*, Chief Judge Friendly discussed briefly Occidental's efforts to secure analogous benefits under § 16(b) by arranging to have the new Tenneco preference shares remain in an unregistered statute through the expiration of the six months (450 F.2d at 160, n. 6). We are aware that he stated that he was not ruling on such a device, but his remark that "[h]opefully this would avoid § 16(b) liability" (emphasis added) may indicate some doubt as to the viability of the theory.

5. SEC Rule 12b–6 provides in pertinent part:
 "A class of securities with respect to which a registration statement has been filed pursuant to section 12 of the Act shall be deemed to be registered for the purposes of sections 13, 14, 15(d) and 16 of the Act and the rules and regulations thereunder only when such state-

ment has become effective as provided in section 12, and securities of said class shall not be subject to sections 13, 14 and 16 of the Act until such statement has become effective as provided in section 12." 17 C.F.R. § 240.12b–6.

6. SEC Rule 12a–5 provides in pertinent part:
 "Subject to the conditions of subparagraph (2) of this paragraph, whenever the holders of a security admitted to trading on a national securities exchange (hereinafter called the original security) obtain the right, by operation of law or otherwise, to acquire all or any part of a class of another or substitute security of the same or another issuer, or an additional amount of the original security, then:
 "(i) all or any part of the class of such other or substituted security shall be temporarily exempted from the opera-

to provide a temporary exemption from one section of the Act (§ 12(a)) and for a restricted purpose (i. e., the "substituted security shall be temporarily exempted from the operation of section 12 (a) to the extent necessary to render lawful transactions therein on an issued or 'when-issued' basis . . ."). We agree with Standard that the above rules carve out, at best, only limited exemptions and not general exemptions from the entire Act or from § 16 in particular. At the very best, Crane's argument as to the effect of the cited rules is doubtful; and the doubt should be decided against Crane, since to construe the rules to establish the exemptions claimed would utterly defeat the monolithic purpose of § 16: to take the profit out of insider dealing.

We now proceed to Standard's "convertibility argument."

Relying primarily on the decision of the Court of Appeals of this Circuit in Chemical Fund, Inc. v. Xerox, 377 F.2d 107 (1967), Standard claims that the test as to whether the holder of a convertible security is directly or indirectly the "beneficial owner of more than 10 per centum of any class of any equity security" [7] is to be determined by "the total percentage of common stock which a holder would own following a hypothetical conversion" of the convertible stock. *Chemical*, supra, at 110. Since it is undisputed that Crane would have owned more than 10% of Standard's common stock had it converted its preference stock, under Standard's view the "exemption argument" would fall by the wayside and Crane would be liable even though the preference stock was not registered or temporarily exempt.

Not surprisingly, Crane has anticipated Standard's "convertibility argument" and contends that the hypothetical conversion test of liability is inapplicable to the facts of this case; and that it is applicable only when the convertible stock is the "equivalent" of the underlying stock. Crane maintains that the Standard preference and common were not "equivalent" because of differences between them as to dividend and liquidation rights, for example.

While the question whether the hypothetical conversion test of liability is applicable in *all* cases involving convertible issues has never been squarely determined, nevertheless the only decisions which bear on the subject have in fact applied the test. Chemical Fund v. Xerox, supra; Simon v. Sunasco, CCH Sec. L.Rep. ¶ 92,547 (S.D.N.Y.1970). We find no reason not to apply the test on the facts of this case. The *Chemical Fund-Sunasco* rationale is consistent with the overall purpose of § 16 and with relevant SEC regulations. On the other hand, the theory proposed by Crane, whatever intriguing intellectual appeal it may have, reaches a result at cross pur-

---

tion of section 12(a) to the extent necessary to render lawful transactions therein on an issued or 'when-issued' basis on any national securities exchange on which the original, the other or the substituted security is lawfully admitted to trading; . . ." 17 C.F.R. § 240.-12a–5(a) (1) (i).

7. Section 16(a)–(b), 15 U.S.C. § 78p(a)–(b), provides in pertinent part:
 "(a) Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security, shall file [specified re-

ports] of the amount of all equity securities of such issuer of which he is the beneficial owner, . . .
 "(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, . . . Suit to recover such profit may be instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer . . . ."

poses with § 16 which we decline to adopt unless it is validated by higher authority.

Since the genesis of the hypothetical conversion test was Chemical Fund v. Xerox, we begin our analysis there. The issue, as stated by Chief Judge Lumbard, was "whether Chemical Fund, the owner of more than ten percent of Xerox Convertible Debentures, is liable for short-swing trading profits as a 'beneficial owner of more than 10 percentum of any class of any equity security' within the meaning of section 16 of the Securities Exchange Act of 1934 . . . ." (at 108).[8] In holding that it was not, the court reasoned as follows:

> "Thus the question is: are the Debentures by themselves a 'class of any equity security,' or does the class consist of the common stock augmented, as to any beneficial holder in question, by the number of shares into which the Debentures it owns are convertible? We think that the Debentures are not a class by themselves; the total percentage of common stock which a holder would own following a hypthetical conversion of the Debentures it holds is the test of liability under section 16(b). The history of the legislation, the stated purpose of the Act, and the anomalous consequences of any other meaning all support this conclusion." *Chemical Fund,* supra, 377 F.2d at 110.

In the case at hand, if Crane had converted its 740,311 Standard preference shares it would have been the holder of 15% of Standard's common stock.

Crane attempts to distinguish *Chemical Fund* on the ground that, unlike a debenture (the convertible security there), which is defined as an "equity security" only because of its convertible nature,[9]

the Standard preference stock is an "equity security" regardless of its convertibility. Crane argues that, therefore, the preference shares are "a class by themselves" and that resort to Crane's hypothetical position in the underlying common stock is not warranted by the rationale of *Chemical Fund.*

We do not think that such an analysis is consistent with the reasoning of the Second Circuit. In the first place, nothing in the opinion suggests that the court intended its rule to apply any the less to convertible preferred stock (which is defined in the Act as an equity security both in its own right and because convertible to another equity security) than to convertible debentures (which are defined as equity securities solely because of their convertibility to an equity security). Secondly, Crane's rationale would lead to the most anomalous results —results the Court of Appeals clearly sought to avoid. *Chemical Fund,* supra, 377 F.2d at 111. For example, as Standard points out, under Crane's theory the closer the holder of the convertible issue is to having a present equity ownership, the *more* likely he is to escape liability under § 16. A holder of a senior debt security convertible into more than 10% of the issuer's common stock would be subject to § 16(b) (*Chemical Fund*), while a holder of an unregistered preferred voting stock convertible into more than 10% of the common would not be liable!

 Furthermore, our construction of the meaning of *Chemical Fund* is supported by the SEC's action in promulgating revised Rule 16a–2 in *Chemical Fund's* wake. Rule 16a–2(b) reads: [10]

> "In determining for the purpose of section 16(a) of the Act whether a

---

8. In *Chemical*, the Fund held more than 10% of the Convertible Debentures but less than 10% of the common following a hypothetical conversion. Here, Crane would own more than 10% of the Standard common upon conversion.

9. Section 3(a) (11), 48 Stat. 884 (1934), 15 U.S.C. § 78c(a) (11).

10. Crane's argument that SEC Rule 16a–2(b) applies only to the reporting requirements of subdivision (a) of § 16 of the Act, and not to subdivision (b), which deals with liability for short-swing profits, is without merit. As Judge McLean pointed out in Simon v. Sunasco, supra, CCH Sec.L.Rep. at p. 98,510, the two

person is the beneficial owner, directly or indirectly, or more than ten percent of any class of equity securities, such person shall be deemed to be the beneficial owner of securities of such class which such person has the right to acquire through the exercise of presently exercisable options, warrants or rights or through the conversion of presently convertible securities."

It is significant that Rule 16a–2 does not use the words "class by themselves," nor does it make any distinction between securities which are "equity securities" in themselves, as here, and those which are equity securities solely because they are convertible into equity securities ("Chemical" securities). The Rule is broad and clearly controls the facts of this case. Therefore, applying the Rule, since Crane had "the right to acquire" more than 10% of Standard's common stock "through the conversion of presently convertible securities," Crane is deemed to have been the "beneficial owner, directly or indirectly, of more than ten percent" of the underlying Standard common.[11]

Under facts substantially identical to the present case, Judge McLean in Simon v. Sunasco, supra, CCH Sec.L.Rep. ¶ 92,-547, found the *Chemical Fund* test, as well as Rule 16a–2(b), to be dispositive. There recovery was sought under § 16 (b) for profits allegedly realized by the defendant Sunasco through its acquisition pursuant to an exchange plan of CUC "special" stock (an unregistered, unlisted voting stock), the conversion of that stock into CUC common (which was registered and listed), and the simultaneous sale of the common. In denying defendant's motion for summary judgment, Judge McLean stated that the first issue to be decided was "whether Sunasco was the beneficial owner, directly or indirectly, of ten per cent of a class of equity security registered pursuant to Section 12, in other words, whether it was the owner, directly or indirectly, of ten per cent of CUC common stock . . ." (p. 98,510).

---

sections are grammatically and legally interconnected:

"The use of the word 'such' ties Section 16(a) and Section 16(b) together and makes it clear that the beneficial owner to whom Section 16(b) refers is the beneficial owner described in Section 16(a)."

11. We disagree with Crane that for the purposes of § 16 a person may only be the beneficial owner of *either* the convertible or underlying stock. Whatever factual validity the assertion may have, SEC Rule 16a–2 states that a convertible security holder is *deemed* to be the beneficial owner of the underlying security. The inevitable consequence of Rule 16a–2 is that a person may be the "owner" of two securities—the convertible security and the underlying common stock—and that a person must comply with the statutory requirements as to *both* securities. This is implicit in Rule 16a–2's direction that

"This paragraph [i. e., paragraph (b) of Rule 16a–2] shall not be construed to relieve any person of any duty to comply with section 16(a) of the Act with respect to any equity securities consisting of options, warrants, rights or con-

vertible securities which are otherwise subject as a class to that section (of the Act)."

Thus, we think that this Rule requires a person to be subject to the requirements of § 16 either when he holds more than 10% of the original convertible security or when he holds more than 10% of the underlying security following a hypothetical conversion. As to convertible *debentures*, under the authority of *Chemical Fund* a holder would *only* be liable if, after a hypothetical conversion, he held more than 10% of the common stock.

Crane's reliance on SEC Rule 155 is misplaced. That Rule was promulgated to prevent issuers from employing the private placement of convertible securities as a vehicle to avoid complying with registration and disclosure requirements as to the underlying security. Its purpose was to *expand* the scope of liability under the *registration provisions of the Act* —not to *limit* liability under § 16. Crane's interpretation would fly in the face of the *Chemical Fund* rationale, as well as the more recent Rule 16a–2, which was promulgated with § 16 specifically in mind.

Relying upon the *Chemical Fund* case and what he termed the "substantially similar" Rule 16a–2(b), and after finding that the CUC special stock was "presently convertible" under the provisions of the exchange plan, Judge McLean concluded that Sunasco was the indirect owner of more than 10% of the common shares. However "unique" the provisions of the exchange plan may have been in *Simon*, we find the controlling facts there virtually indistinguishable from those presented to us. The crucial question here, as it was in *Simon*, is whether the holder had the "right to acquire" the common stock through the conversion of presently convertible securities. The special stock in *Simon* was no less "a class by itself" than the Standard preference stock. Furthermore, Judge McLean had no difficulty in applying the hypothetical conversion test despite the fact that the special stock was an "equity security," both in its own right and as a convertible security.

We cannot agree with Crane that *Simon* is distinguishable on the ground that there was a "complete equivalence" of the CUC special stock and common stock, when Judge McLean, in specifically taking issue with the defendant who made the same contention, stated:

"In *Blau*, the Court of Appeals said that there was 'economic equivalence' between the preferred and the common, that the conversion of preferred into common did not change the holders' 'investment position' . . . [Blau v. Lamb, 363 F.2d 507, 522 (2d Cir. 1966).]

"In the present case, on the contrary, there certainly was a change in Sunasco's investment position. It acquired special stock. Within a few weeks or months thereafter, it converted special into common and sold the common simultaneously with the

conversion, and realized cash, thereby making a 'trading gain.'" Simon v. Sunasco, supra, CCH Sec.L.Rep. pp. 98,511–12.

Crane further argues that, assuming arguendo it had the *status* of an insider of the Standard common stock by virtue of the conversion test, Crane's *transactions* in the preference stock are nonetheless shielded from § 16(b) liability because they involved the purchase and sale of exempted securities. Crane contends that, while it may be arguable that the owner of a convertible security also *owns* the underlying security, it is a wholly different thing to say that the sale of a convertible security also constitutes a *sale* of the underlying security.

■ We disagree. Crane's sole argument seems to run in the following syllogism: (a) § 16(a) refers to "direct" or "indirect" ownership; (b) § 16(b), which governs as to short-swing sales, contains no such language; (c) ergo, Congress did not intend that a direct sale of the convertible security should also be considered an indirect sale of the underlying security. We find the rationale unconvincing. First, as stated above in footnote 10, subsections (a) and (b) of § 16 cannot be read in isolation. The "beneficial owner" subject to subsection (b) liability for executing covered *transactions* ("purchase and sale or any sale and purchase") is the same beneficial owner referred to in subsection (a). Secondly, in *Simon*, Judge McLean had little difficulty in finding the defendant subject to subsection (b) liability despite the fact that some of the special CUC stock had never actually been converted or, in other words, that no *transactions* had actually taken place in that stock. In this argument Crane overlooks the whole thrust of the conversion test—that a holder of a convertible security may be subject to § 16(b) liability following a *hypothetical* conversion.[12]

12. Crane's final argument—assuming arguendo that it, as owner of the Standard preference stock, was the beneficial owner of the underlying Standard common, nevertheless § 16 would not apply since that common stock was itself unissued, and

We think the possibilities for speculative abuse are as great here, if not greater, than in *Simon,* supra. See Cook & Feldman, Insider Trading Under the Securities Exchange Act, 66 Harv.L.Rev. 612, 626 (1953). It seems to us that Crane's arguments would have the inevitable consequence of creating a loophole at odds with the purposes of § 16(b) by permitting the opportunity to trade in unregistered convertibles and derive all the advantages of the publicly traded underlying stock (See Meeker & Cooney, The Problem of Definition in Determining Insider Liabilities Under Section 16(b), 45 Va.L.Rev. 949, 960 (1959)), all the while being insulated from § 16(b) liability because of the convertible's unregistered status.

In sum, we think that Crane has woven an ingenious web of technical arguments which, at the best, raises doubts as to the construction of the statute and various SEC rules. But, as the Supreme Court has very recently stated in Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed. 2d 575 (1972):

> "[W]here alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders."

Crane's motions for summary judgment are denied. Standard's motion for summary judgment is granted.

It is so ordered.

---

*therefore* unregistered under § 12 of the Act, at the time of Crane's transactions in the Standard preference stock—is simply without merit. Crane's reliance on SEC Rule 12d1–1(a), which allows registration of an entire *class* of securities so that issuance of some shares can be delayed, is totally inappropriate to the question of § 16(b) liability. The fact that the Standard common stock was admitted-

---

ly registered as a *class,* albeit not yet issued, is sufficient to subject Crane to the purpose and language of § 16 which applies to 10% holders "of any *class* of any *equity security registered pursuant to Section 12.*" (emphasis supplied). It is not necessary that the particular shares held by the defendant be issued; it is sufficient if the class as a whole is registered.