AMERICAN STANDARD, INC.,
Plaintiff-Appellee,

v.

CRANE CO., Defendant-Appellant and
Third-Party Plaintiff,

v.

Edward J. HANLEY et al.,
Third-Party Defendants.

No. 97, Docket 74–1233.

United States Court of Appeals,
Second Circuit.

Argued Oct. 23, 1974.

Decided Dec. 20, 1974.

Certiorari Denied June 2, 1975.

See 95 S.Ct. 2397.

See also, D.C., 60 F.R.D. 35.

**1046**

Abraham L. Pomerantz, New York City (Pomerantz Levy Haudek & Block,

William E. Haudek, and Lord, Day & Lord, John W. Castles 3rd and Michael J. Murphy, New York City, of counsel), for defendant-appellant Crane Co.

David W. Peck, New York City (Sullivan & Cromwell, Edward W. Keane, Robert M. Osgood and Marcia B. Paul, New York City, of counsel), for plaintiff-appellee American Standard, Inc.

Herbert L. Scharf, New York City (Bobroff, Olonoff & Scharf, Alfred Olonoff, New York City, of counsel), for plaintiff-appellee Kritzler.

Wolf, Popper, Ross, Wolf & Jones, New York City (Donald N. Ruby and Robert M. Kornreich, New York City, of counsel), for plaintiff-appellee Abrams.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is the third in a trilogy of appeals to come before this court in the continuing litigation between American Standard, Inc. ("Standard") and Crane Co. ("Crane") arising out of the contest for control of Westinghouse Air Brake Company ("Air Brake") which Standard has won, succeeding in effecting a merger of Air Brake into Standard. In Crane Company v. Westinghouse Air Brake Company et al., 419 F.2d 787 (2 Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) (Crane I) this court held, *inter alia,* that Standard had violated both Section 9(a)(2) and Rule 10b–5 of the Securities Exchange Act by a market manipulation which artificially raised the price of Air Brake stock on the last day of Crane's tender offer for the stock, and remanded that cause for appropriate remedies.[1] In Crane Co. v. American Standard, Inc., 490 F.2d 332 (2 Cir. 1973), we held that the fraud action mentioned above should be tried to the court without a jury (Crane II).

The present appeal concerns a separate action brought against Crane for alleged violation of Section 16(b) of the Securities Exchange Act ("the Act") by Standard, as well as by two stockholders

---

1. The court held in favor of Standard on all other points including an attack on its proxy statement.

of Air Brake, Kritzler and Abrams, and a stockholder of Standard, to recover alleged short-swing profits of Crane.[2] The short-swing profits are alleged to have arisen through trading by Crane in equity securities of Air Brake up to the date of Air Brake's merger with Standard and of the merged company thereafter.[3]

The District Court, Lasker, J., denied Crane's motion for summary judgment and granted partial summary judgment to Standard on the issue of Crane's liability. 346 F.Supp. 1153. Crane appeals from this decision by permission of this Court pursuant to 28 U.S.C. § 1292(b) and F.R.A.P. 5.

Though the background of this controversy has been set forth in previous opinions, it is necessary to repeat it to some extent. Crane first proposed a merger of Crane and Air Brake to the Air Brake management on May 15, 1967. 419 F.2d at 790. In June 1967 Crane began to acquire large quantities of Air Brake shares in the open market for the purpose of acquiring control. It continued its purchases into 1968. On December 7, 1967 Air Brake changed its bylaws to raise the minimum cumulative vote needed to obtain representation on the board from 9.1 to 25 per cent. 419 F.2d at 790. On December 13, 1967 Air Brake declined the proposal for merger.

Although Crane then briefly discontinued its open market purchases of Air Brake common stock, it resumed them in January becoming a more than 10% owner on January 26, 1968, thereby achieving the status of a "beneficial owner" for § 16(b) purposes.

Air Brake responded by arranging a "defensive" merger with Standard. On

2. The actions were consolidated in January 1969, 490 F.2d at 338. The claim of Kritzler and Abrams is that Crane is liable to the former Air Brake stockholders rather than to Standard. Under the order of consolidation this claim is in abeyance pending determination of whether Crane is liable.

3. Section 16(a) reads:

"Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security, shall file, at the time of the registration of such security on a national securities exchange or by the effective date of a registration statement filed pursuant to section 78*l* (g) of this title, or within ten days after he becomes such beneficial owner, director, or officer, a statement with the Commission (and, if such security is registered on a national securities exchange, also with the exchange) of the amount of all equity securities of such issuer of which he is the beneficial owner, and within ten days after the close of each calendar month thereafter, if there has been a change in such ownership during such month, shall file with the Commission (and if such security is registered on a national securities exchange, shall also file with the exchange), a statement indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month."

Section 16(b) reads:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

February 20, 1968 A. King McCord, President of Air Brake, met with several of his directors to consider a proposal which had been submitted by Blyth & Company the day before, to merge Air Brake into Standard by exchanging Air Brake common stock for a Standard security to be valued at about $50 per share. Air Brake common was then quoted at about $36 per share. 419 F.2d at 791.

On the very day McCord was meeting on the Standard merger proposal, Crane, now a 10% stockholder, filed a 14B statement with the Securities and Exchange Commission declaring its intention to solicit proxies for the Air Brake Board election.

On March 1, 1968 McCord reached an agreement on the terms of the merger with representatives of Standard, and on March 4 the Air Brake Board voted its approval. On March 5 Air Brake informed its shareholders of the terms of the agreement and of the Board's approval. Air Brake stock rose to $44. (ibid.)

In the proposed merger, every two shares of the outstanding Air Brake stock were to be converted into one share of a new class of Standard $4.75 cumulative convertible preference stock.

Each Standard preference share was to be convertible into 2⅔ shares of Standard common. Upon consummation of the merger Air Brake's existence was to end.

In the face of this previously announced merger agreement by Air Brake and Standard managements, Crane on April 6, 1968 publicly announced a registered tender offer to exchange $50 face value of its debentures for each Air Brake share.[4] The offer was to expire April 19 unless renewed. At this time, as has been noted, Crane was already a 10% holder of Air Brake common. Air Brake reacted quickly. On April 8, 1968, Air Brake called a meeting of its stockholders for May 16 to vote on the proposed merger with Standard. The Crane offer was set to expire unless renewed, as noted, about a month before that stockholders' meeting.

On the last day of Crane's tender offer, April 19, as this Court held, 419 F.2d 787, Standard fraudulently manipulated the market through a series of concealed wash sales with the intended result that the market price of Air Brake rose to $50. Crane's initial offer failed. Crane extended its offer three times to April 29, May 14 and May 24, 1968, but failed to gain a majority.[5] On April 17, 1968

---

**4.** In exchange for each Air Brake share, Crane offered to issue $25 principal amount of its 5% subordinated convertible debentures and $25 principal amount of its 7% subordinated debentures, both due in 1993. The 5% debentures were convertible into Crane common stock at $50 per share (i. e., 20 shares for each $1,000 debenture).

**5.** Judge Smith described Standard's April 19th activities and their result as follows:

"The critical day in the take-over battle was April 19, the day Crane's tender offer for Air Brake stock was to expire. The holders of Air Brake stock could be expected to delay until the last moment in order to make a decision based on the latest market information, i. e., to compare the value of the tender offer, here not more than $50, with the market price on the day the offer was to expire. In fact, 85 percent of the shares tendered to Crane by the 19th were offered on that day. [citation] On April 19, Air Brake opened at 45¼ on the New York Stock Exchange, giving Crane's

tender offer a good prospect of success. The surest way to defeat the Crane offer was to run the price up to $50. The tape did quickly reach $50 on April 19, and Crane's tender offer failed. Crane's claim that this was the result of extraordinary transactions by Standard is supported by the record.

". . . The net result of this buying was to present to the public, whose primary source of information is the tape, that there was a great demand for Air Brake at an increased value. It is reasonable to conclude that many Air Brake stockholders who might otherwise have chosen to tender to Crane chose not to do so because their own holdings in Air Brake looked better as the price went up. . . .

"Standard had 'painted the tape' in Air Brake stock. . . .

"Standard's extraordinary buying here, coupled with its large secret sales off the market, inevitably distorted the market picture and deceived public investors, particularly

Crane brought a federal court action against Air Brake charging a violation of the proxy rules. On May 6, 1968, Crane brought suit against Standard and its underwriter, Blyth and Company, under the fraud provisions of the Act and Rule 10b–5 to enjoin the merger. The District Court ultimately dismissed the action.[6]

On or about May 16, 1968, the Air Brake stockholders voted to approve the merger with Standard. On June 7 the merger became effective and the Standard convertible preference stock became available for exchange for Air Brake common. By this time, Crane owned 32% of Air Brake common. Between June 7 and June 13, Crane actually exchanged its then holdings of 1,408,623 Air Brake shares for 740,311 of Standard. Standard was Crane's largest competitor in the plumbing industry. 419 F.2d at 791. Crane also became by virtue of the merger, the largest, or one of the largest stockholders of Standard.

On June 13, Crane sold 730,311 shares of Standard convertible preference stock on the New York Stock Exchange for $76,134,921.75 at a profit estimated at over $10,000,000. Four days thereafter, on June 17, 1968, Standard commenced its present 16(b) action. Shortly after that Crane sold 9,000 of its remaining 10,000 shares.

Crane had acquired its Air Brake stock as follows:

| | Air Brake Shares Purchased by Crane |
|---|---|
| 6/15/67—1/26/68 (market) | 469,200 |
| 1/31/68—4/2/68 (market) | 202,900 |
| 4/19/68 (tender offer) | 316,662 |
| 4/29/68 (first extension of tender offer) | 212,883 |
| 5/14/68 (second extension of tender offer) | 98,594 |
| 5/24/68 (third extension of tender offer) | 180,384 |
| | 1,480,623 |

Standard contends in this court that Crane, through its Chairman, Thomas Mellon Evans, had the possibility of acquiring inside information and that it actually did acquire such information. Crane denies the fact but urges us not to consider this argument, in any event, because the facts now urged in support had not been called to the attention of the District Court on the motion for summary judgment.[7] These alleged facts deal largely with the activities of Evans.

The facts relevant to Evans' activities as they appear in the affidavit of George C. Kern, Jr., annexed to the motion papers on the summary judgment motion, were given as follows:

In June 1967 the Crane Board authorized Evans to buy Air Brake stock as he thought it advisable. In the latter part

---

the Air Brake shareholders." 419 F.2d at 792–793.

**6.** This court reversed the dismissal of the fraud action in Crane I.

**7.** A motion for summary judgment was made by Crane on May 27, 1970 on the ground that "the findings of the Court of Appeals [in Crane I] are dispositive of this action and entitle Crane to summary judgment dismissing the consolidated complaint. Standard cross-moved for summary judgment on June 23, 1970 on the issue of liability alone. It based its motion on an "annexed affidavit of George C. Kern, Jr., the record in the two civil actions (heretofore consolidated) entitled 'Crane Co., plaintiff, against Westinghouse Air Brake Company et al., defendants' (S.D.

N.Y. No. 68 Civ. 1560) and 'Crane Co., plaintiff, against American Standard, Inc., et al., defendants' (S.D.N.Y. No. 68 Civ. 1845), 'Plaintiff's Statement of Material Facts Pursuant to this Court's General Rule 9(g), defendants' answers to plaintiff's interrogatories dated July 2, 1968 and all pleadings and proceedings heretofore had herein.' "

Kern's affidavit also mentions "a third action brought in the Court of Common Pleas of Allegheny County, Pennsylvania, entitled 'Crane Co., plaintiff, against Westinghouse Air Brake Co., defendant' (No. 249 April Term, 1968)" and purports to incorporate by reference the trial transcript, although the notice of motion itself makes no mention of the Pittsburgh action.

of 1967, Crane revealed its substantial ownership to the Air Brake management and proposed that Air Brake be merged into Crane. On December 13, 1967 Evans was told by Air Brake that it was not interested in any kind of merger with Crane. The Chairman of Crane "came to the conclusion that there was no way we could deal with them or that they would deal with us." By January, 1968 Crane had "dropped" its plans to merge with Air Brake. It bought no stock between January 5 and January 24. In the early part of 1968 Crane had heard "from various sources" that Air Brake was negotiating with other companies. On March 4, 1968, the President of American Standard, W. D. Eberle, met with Evans and told him that Air Brake and Standard had agreed to merge and that a press release to that effect would be issued later in the day.

Judge Lasker's attention was not called to any specific incident in which Evans purportedly received inside information.

Standard now urges us to consider additional facts not directly called to Judge Lasker's attention but which it argues could have been found by combing the record. It notes that, between the acquisition of beneficial owner status on January 26, 1968 and the public announcement of the Air Brake-Standard merger on March 4, 1968, Evans met with Air Brake Director Mayer and separately with Director Shoemaker on February 23rd, and had a telephone conversation with Mayer on February 16 and with Chairman McCord and Director Hanley on February 23. Mayer, who was also Chairman of the Mellon Bank, which was one of Crane's banks, argued against the Standard merger and discussed favorably with Evans putting some Crane representatives on the Air Brake Board. In pursuit of that objective, Evans telephoned Mayer on February 23rd to ask if he would not arrange a meeting with the directors of Air Brake to consider his request for three directors on the Air Brake Board. During the conversation Mayer told Evans that he thought Air Brake was going to get an offer of $50 in cash. He did not mention the name of the offeror. Nor did he mention an acquisition of Air Brake for a certain number of convertible preference shares nor any ratio of exchange. Evans replied that they had not bought the stock for "stock speculation," that he would like to hear more about it "but I don't think that is what we want." [8]

Before becoming a 10% holder, Evans had heard through a proxy solicitor, who was under retainer to Crane, that Air Brake management intended to peddle the company, apparently to thwart Crane's attempt to take over. Having become aware of this classic defensive maneuver to defeat an unwanted suitor Crane apparently decided to become a 10% holder, to continue buying beyond that point and not to give up the fight.

After the February 23rd conversation with Mayer the schedule of stock purchases indicates that Crane did nothing about the "information" either immediately or on a large scale. Crane bought no shares whatever until March 1 when it picked up 1200 shares to add to the 500,000 shares it already owned. By

**8.** On March 1, 1968 Evans sent a telegram to Air Brake's Chairman stating:

"We are advised that you have been negotiating a merger or sale of Westinghouse Air Brake Company. . . . Request that you and your directors make no commitment with respect to merger proposals involving other companies without first giving Crane Co. your Company's largest stockholder the opportunity to make a counter proposal that would be more favorable to all [Air Brake] stockholders. . ."

On April 4, 1968 Evans and associates met with the Air Brake Board, analyzed the Standard balance sheet as overstated, and still pressed for approval of Crane's plan instead. When the presentation of Crane was turned down, Crane announced its tender offer two days later, on April 6.

The other subject of the meeting was the request of Crane for a stockholders' list which was refused absolutely. Crane had to sue to get the list. Crane Co. v. Westinghouse Air Brake Co., 56 Misc.2d 538, 288 N.Y.S.2d 984 (Sup.Ct.N.Y.Co., 1968).

March 4 when the merger was publicly announced, Crane had acquired an additional 1600 shares of Air Brake.

■ As we have seen, on March 4, the Air Brake people informed Evans that they would announce a merger with Standard later that day, which they did. After the terms of the Standard merger had been announced and had become public property, Crane engaged in large purchases of Air Brake, culminating in its own tender offer of April 6 described above.[9] There is no clear evidence tendered to us of the likelihood that Crane had received any other information that could be classified as "inside information" after becoming a 10% holder which was not also public knowledge.[10]

### The Claim

The claim that Crane is liable to Standard for its profit embraces the following alternative theories of "purchase" and "sale": Claim (1) The purchase of Air Brake shares on January 26, 1968 which put Crane in the position of a 10% holder was the initial "purchase", and the exchange of that stock pursuant to the merger terms for Standard convertible preference stock was the "sale"; Claim (2) The "purchase" was the exchange of Air Brake stock for Standard convertible preference shares under the merger terms, and the "sale" was the sale for cash of those shares within six months; Claim (3) The purchase of the Air Brake stock as in Claim (1) was the "purchase", and the matching "sale" was the sale of the Standard convertible preference stock received on the merger.

### Proceedings in the District Court

The District Court rendered its decision granting summary judgment to Standard on liability under § 16(b). 346 F.Supp. 1153 (Oct. 12, 1971), a day before this Court decided Abrams v. Occidental

Petroleum Corp., 450 F.2d 157 (2 Cir. 1971). The District Court had noted that "Abrams had many elements in common with the instant action" and it had followed the reasoning of the District Court in that case, 323 F.Supp. 570, the reversal of which was announced by the Court on the following day.[11]

Following the reversal of Occidental, Judge Lasker withdrew his opinion to consider its effect. After consideration, the District Court adhered to its earlier decision in a supplemental opinion. 346 F.Supp. 1165. This appeal is from that decision.

In its first decision the District Court had held that Crane was liable under 16(b) for its profits on the basis of what we have called Claim (1); that is, that the *exchange* of Air Brake common stock for Standard convertible preference stock was a "sale" for 16(b) purposes. The District Court reasoned that a company seeking to acquire a target company must know that there was a likelihood of a defensive merger which, upon its consummation, would give it a handsome profit even if it failed to succeed in the takeover. This was thought to create a "heads I win, tails you lose" situation which required the imposition of liability under 16(b).

In this first decision the District Court held accordingly "that the conversion of Crane's Air Brake stock into Standard stock constituted a sale of Air Brake to be matched against its cash purchases of that stock within a period of six months prior to the date of conversion." 346 F.Supp. at 1161. Alternatively, the District Court, treating the Standard stock and the Air Brake stock as the same stock, held that the "sale" for 16(b) purposes was the cash sale by Crane of the Standard convertible preference stock within six months of its original acquisition of the Air Brake common stock. 346 F.Supp. at 1163.

---

9. After the merger plan was announced it was not "inside information". See Kern County Land Co. v. Occidental Corp., 411 U.S. 582, 597–598, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

10. In any event, no information was given to Crane by virtue of its ten per cent ownership.

11. The decision of this court was later aff'd sub nom. Kern County Land Co. v. Occidental Petroleum Corp., *supra.*

When the decision of this Court in the *Occidental* case was called to the attention of the District Court, it recognized that on the question of whether Crane's position offered the opportunity for speculative abuse, this court's *ratio decidendi* in *Occidental* might well raise serious doubts whether Standard's motion for summary judgment could be granted on the basis that the *exchange of Air Brake stock for Standard stock in the merger* was a "sale" that triggered 16(b) liability. Instead, the Judge wrote a supplementary opinion in which he now relied upon the alternative theory of liability, what we have called Claim (3). The District Court held that, putting the exchange of stock on the merger to one side because of the *Occidental* decision, there was, nevertheless, a purchase of Air Brake stock and a sale for cash of the Standard stock received on the merger within six months which must be matched for § 16(b) purposes. 346 F.Supp. at 1167–1168. He properly noted that in *Occidental* the actual sale for cash (through the exercise of an option) took place more than six months from the effective date of purchase for § 16(b) purposes, whereas here the sale for cash was within the six months period.

The appellee, thus, does not come to this court with the benefit of a holding by the District Court in the face of the *Occidental* reversal that it was the *exchange of stock in the merger* that was the "sale" for § 16(b) purposes.[12]

Nor does it appear from the tenor of Judge Lasker's supplementary opinion that Standard pressed upon him seriously the contention, now pressed upon us, that *Occidental* is distinguishable because Occidental had no opportunity for access to inside information, while in the instant case there was such opportunity for access.[13]

### The Occidental Opinion

To set the matter in perspective, a review of the *Occidental* case is in order.

That, too, involved a takeover situation with a contest for control and a defensive merger that defeated the takeover bid. After unsuccessful efforts by Occidental to induce the management of Old Kern to discuss a merger, Occidental on May 8, 1967 published an offer to purchase at $83.50 per share 500,000 shares of Old Kern for cash. Old Kern advised its stockholders not to tender. By May 10 more than 500,000 shares of Old Kern shares had been tendered. On May 11, Occidental, already a beneficial owner of more than 10% of Old Kern stock, extended its offer to encompass an additional 500,000 shares. Old Kern again advised its stockholders not to tender.

On May 19 Old Kern's directors announced their approval of a merger proposal from Tenneco, Inc. ("Tenneco") whereby Tenneco would exchange its own convertible preference shares said to be worth $105 per share for a transfer of Old Kern's assets to New Kern, a wholly-owned subsidiary of Tenneco.

On June 7 Occidental gave up the contest and granted Tenneco an assignable option to purchase 886,623 shares at a fixed price, the option being exercisable at any time after December 9, 1967, six months and a day after Occidental's last contemplated acquisition of Old Kern shares. Tenneco paid $10 per share for the option which it later sold. On December 11, 1967, after the six months period had elapsed Occidental tendered its Old Kern shares for Tenneco preference stock. The assignee of the option then exercised the option, purchasing all the preference shares that Occidental had received on the exchange of stock under the Tenneco-Old Kern plan.

---

**12.** Not discussed, however, was the question whether the exchange of Air Brake stock for Standard stock on the merger could be deemed a "purchase" of Standard stock for Section 16(b) purposes to be matched against the sale of the same Standard stock within six months.

**13.** At this point we cite the case as *Occidental* (2 Cir.) rather than *Kern County* (Supreme Court) because Judge Lasker had before him at the time of his supplemental opinion of July 6, 1973 only the decision of this court. *Kern County* was not decided until May 7, 1974.

New Kern then sued Occidental for its "short swing" profits under 16(b) on two theories: (1) that Occidental had "sold" its Old Kern shares when at the August 30 closing between Old Kern and New Kern it became irrevocably entitled to Tenneco preference stock and (2) that the execution of the option agreement of June 2, 1967 constituted a "sale" by Occidental of the Old Kern shares.

## I

This court reversed a summary judgment in favor of New Kern and directed dismissal of the complaint. The holding concerning the option need not concern us here.[14] The holding that the exchange of Old Kern common stock for Tenneco convertible preference stock did not constitute a sale for 16(b) purposes is highly relevant, however, to our inquiry. In this regard, the similarity of *Occidental* to the case at bar is striking.

Judge Friendly, for the Court, essentially held that although in the "garden-variety purchase and sale or sale and purchase within six months" the statute operates as a "crude rule of thumb," nevertheless, where there is a conversion of securities the court would look into whether "the conversion could have lent itself to speculative abuse." 450 F.2d at 162.

This court noted that we had held an exchange of stock pursuant to the particular merger to be a sale for § 16(b) purposes in Newmark v. R.K.O. General, Inc., 425 F.2d 348 (2 Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). Judge Kaufman (now Chief Judge) had adopted a pragmatic approach in that case. This court was of the opinion in *Occidental* that "the indispensable predicate to the holding that the particular exchange there at issue was within § 16(b) was the finding that R.K.O.'s knowledge of the impending merger *coupled with the ability to control it* involved the possibility of speculative abuse with which § 16(b) [was]

meant to deal." 450 F.2d at 163. (emphasis supplied).

The Supreme Court granted certiorari and affirmed. *Kern County, supra.*

■ We believe that *Kern County* holds the defensive merger situation to be *sui generis* in terms of § 16(b) liability. The implication is that the status of a defeated tender offeror affords no presumption of abuse of confidential information by virtue of relationship to the issuer. By status it is accordingly not "presumed to be an insider who will receive information regarding the company before it is made public." See Chemical Fund, Inc. v. Xerox Corp., 377 F.2d 107, 110 (2 Cir. 1967). The adversary stance also rebuts the presumption of control.

■ In *Occidental,* this court was faced with a situation where the tender offeror had given up the fight. That it remained vulnerable to a defensive merger did not make it more of an "insider" than it had been before. Occidental had given up in the face of the Tenneco defensive merger. Crane had not. Instead, Crane had continued to fight for control and to try to defeat the Standard merger. We are now called upon to determine whether the difference in the reactions of Occidental and Crane to the respective defensive mergers makes a decisive difference. We think not. We think the similarities outweigh the differences.

As we noted in the *Occidental* case, tender offers "often operate to the great benefit of stockholders of the target corporation", 450 F.2d at 164. When sometimes the management of a company whose shares are held by many small stockholders becomes stolid and unprogressive to the detriment of its stockholders, tender offers for the company redound to their advantage. They are given a chance to sell out at a price above the market, stay with a new management, or become the beneficiaries of a possibly higher offer in a defensive merger.

---

14. The court held that the granting of the option (a "call") was not a sale. The actual

exercise of the option occurred after the six months period for 16(b) purposes had passed.

The making of a tender offer after the terms of the merger have been announced puts the stockholder of the target company in an enviable position of choice with all the cards on the table under the proxy rules. To discourage such contests would tilt the scales against the small stockholder and in favor of management. His right to evaluate the competing securities offered in exchange would be frustrated. We see no public policy to be promoted in such case through the medium of Section 16(b).

Nor can we say that Crane would not have achieved control through its tender offer if Standard had not painted the tape to discourage tenders. We need not repeat Judge Smith's penetrating analysis in Crane I, supra. Suffice it to say that Crane apparently exerted its best efforts to win. If it had won, the defensive merger would not have come into being.

The important consideration is that the information Crane was likely to receive was in no way increased by its making of a tender offer. On the contrary, the sharpness of an open contest for control would make it even more an adversary. The terms of the merger it was opposing were known to all the stockholders of Air Brake as well as of Standard. The current financial conditions of both companies had become public property or would soon become public property, depending on when the proxy statements were issued.

Old Kern, like Air Brake, had advised its stockholders not to tender. Like Air Brake, Old Kern had agreed to a defensive merger.

Crane, like Occidental, went to litigation in its attempt to win control. Crane, like Occidental, was an antagonist of the target company's management. Neither, despite "beneficial owner" status, had a single director of its choosing nor any control over the terms or timing of the merger.

The crucial question the Supreme Court faced in *Kern County* was a resolution of the difference of opinion on how far the automatic sanctions of § 16(b) should be applied to unorthodox transactions. It accepted the "pragmatic approach" that in merger situations the policy objectives of Congress in the enactment of Section 16(b) should be considered. *Kern County*, 411 U.S. at 594, n. 26, 93 S.Ct. 1736.

■ The pragmatic test of borderline transactions had become "whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short swing profits based upon access to inside information." 411 U.S. at 594, 93 S.Ct. at 1744. The court did not rule that a merger may never result in a § 16(b) violation,[15] but it apparently distinguished Newmark v. R.K.O. General, Inc., *supra*, and Park & Tilford v. Schulte, 160 F.2d 984 (2 Cir.); cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947), as cases where the defendant, unlike Occidental, had participated in or controlled the merger agreement or its equivalent. 411 U.S. at 599, 93 S.Ct. 1736.

■ The emphasis in Mr. Justice White's opinion was on two factors: 1) The unlikelihood of actual access to inside information in an atmosphere of hostility by a party adverse in interest; and 2) the utter inability of the unsuccessful party to control the course of events. It is not enough that a sophisticated tender offeror may assume that if his bid fails because of a defensive merger he will probably profit if the defensive merger actually occurs. Such speculation is common but it is not the product of inside information. It is rather a sophisticated prophecy which is open to all public stockholders who possess no

---

15. Contrary to the inference drawn by appellee, the court was careful not to state its caveat in terms of "defensive" mergers but rather of "mergers" generally. It is certainly true that mergers, as in *R.K.O., supra*, can result in § 16(b) violations, as well as Rule 10b–5 violations. Dasho v. Susquehanna Corp., 380 F.2d 262 (7 Cir. 1967), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1969).

inside information whatever. Such a neutral prophecy is beyond the reach of § 16(b). Mr. Justice White noted that even the expectation that the public tender might increase the likelihood of a defensive merger is not related to the use of inside information unavailable to public stockholders. 411 U.S. at 598, 93 S.Ct. 1736. In the words of Mr. Justice White:

"If there are evils to be redressed by way of deterring those who would make tender offers, § 16(b) does not appear to us to have been designed for this task." 411 U.S. at 597–598, 93 S.Ct. at 1746.

■ The teaching of *Kern County* is that for Section 16(b) liability there must be a likelihood of access to inside information "*by reason* of its ownership of more than 10% of the outstanding shares", 411 U.S. at 596, 93 S.Ct. at 1745 (emphasis supplied), that is, "by virtue of its stock ownership" 411 U.S. at 599, 93 S.Ct. at 1747. The otherwise casual acquisition of inside information through personal friendship and its use could be a violation of Section 10(b) and Rule 10b–5, but the irrebuttable presumption of § 16(b) should not be applied.

■ The very concept that stock ownership beyond a certain percentage makes the owner a statutory "insider" was based on the assumption that such percentage was enough to make him an "influential stockholder." [16] The 10% holder in the garden variety case is presumed to be "influential" as a friend of management or in control of some directors.

■ The essential policy objective of Section 16(b) is to prevent the *abuse* of confidential information by directors, officers and beneficial owners. Ordinarily, this simply requires a matching of the "sale" and "purchase," or "purchase" and "sale" in less than six months. When the setting is not one of control, but of

its antithesis, the very weakness of the tender offeror in being unable to thwart the merger is further evidence that he does not control the target company's directors or stockholders.

■ We thus have a tender offeror who does not have access to inside information about the target company *by virtue of his position as a "beneficial owner"*, coupled with an inability, as further evidenced by the vote on the merger, to affect the course of the target company. It is this combination of circumstances that dictated the result in *Kern County* and dictates the conclusion on this appeal that the exchange of stock pursuant to the merger terms was not a "sale" for § 16(b) purposes.

We hold that whether the tender offeror quits fighting when the defensive merger is announced or continues to fight in the hope of winning, his exchange of stock on the merger after he has been defeated is not *ipso facto* a "sale" for § 16(b) purposes.

■ We inquire then whether facts were presented below that overcame the controlling effect of *Kern County*.

In his first opinion, on cross-motion for summary judgment, the able District Judge had stated that "as to liability, there are no genuine issues as to material facts." 346 F.Supp. at 1155. The District Court phrased as the "preliminary but decisive" question: "Were there opportunities for speculative abuse?" 346 F.Supp. at 1157, 1159. In answering the question in the affirmative, it relied simply on the general knowledge of all tender offerors rather than on any specific knowledge by Crane. Indeed, in stating the facts of the *R.K.O.* case, *supra*, the District Court noted, as one of the salient facts, that R.K.O. "had knowledge of the merger" and characterized this as "facts not present in the instant case." 346 F.Supp. at 1160.

---

**16.** Thomas Corcoran, testifying before the Senate Committee on Banking and Currency on February 23, 1934 said that the section (then numbered § 15) should apply "to every influential stockholder who, by reason of his position—and 5 percent is a lot of stock in a modern corporation—is on the inside of the circle." Hearing on Stock Exchange Practices, p. 6555.

Judge Lasker made no mention of any contention of Standard that Crane had particular knowledge beyond the general knowledge that a tender offeror normally has. When the recent decision in *Occidental* by this court was called to his attention the Judge did not distinguish it upon the ground that here Crane had greater access than Occidental had possessed.

We have examined the briefs which were filed by Standard in the District Court six weeks after our decision in *Occidental*. Nowhere was there pressed upon Judge Lasker the present contention that "the evidence shows that Crane had access to, and in fact possessed, confidential information about Air Brake and its successor" (Point 1A, Standard's Brief).[17] On the contrary, Standard relied on the argument that "Crane's aggressive participation in a prolonged corporate struggle" was in contrast to "Occidental's role as a mere bystander." The point made was that Crane, by continuing its purchases after public knowledge of the merger, took advantage of the Air Brake stockholders because Crane had to know that the proposed merger would make the stock go up, but not because it was in a position to be "fed" inside information.

Nor was the 9(g) statement under the local rules of the Southern District on motions for summary judgment amended by Standard to show accessibility to inside information either as a disputed or as a conceded fact.[18]

Since we have found upon the record as presented by Standard that there was no accessibility of Crane to Air Brake inside information "by reason of its ownership of more than 10% of the outstanding shares" *Kern County*, 411 U.S. at 596, 93 S.Ct. at 1745, we need not decide whether we are foreclosed on appeal from considering the facts tendered by Standard which it failed to call to the attention of the District Court on the motion for summary judgment. We leave that question to another day.[19]

**II**

We now turn to the contention that the "purchase" for § 16(b) purposes was the exchange of Air Brake common shares for Standard convertible preference shares and that the "sale" was the sale of those shares within six months.

We have already stated the reasons why we find the exchange pursuant to the merger not to have been a "sale" of the Air Brake shares, and we include as a factor the nonvolitional character of the exchange. It would be anomalous, for the same reasons, to hold the identical transaction a "purchase" of the Standard shares.

In Gold v. Sloan, 486 F.2d 340, 344 (1973), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), the

---

17. The omission may have been a sophisticated stratagem by Standard's able counsel to prevent an issue of fact from arising which might preclude summary judgment in its favor on what it thought were winning grounds. In its statement of material facts pursuant to General Rule 9(g) of the District Court Standard listed three facts as to which there exist genuine issues to be tried but failed to list whether Crane, in fact, had the possibility of access to inside information. We can hardly say that this was an unwise gamble.

18. Rule 9(g) of the "General Rules of United States District Courts for the Southern and Eastern Districts" reads as follows:

"Upon any motion for summary judgment pursuant to Rule 56 of the Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as

to which the moving party contends there is no genuine issue to be tried.

"The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

"All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

19. We surely cannot approve a practice, however, of dumping an extensive record on a busy District Judge without guidance from counsel, expecting him to ferret out facts which might conceivably be relevant on a motion for summary judgment.

Fourth Circuit held, in a decision rendered after *Kern County, supra,* that whether the exchange of stock pursuant to a merger is a "purchase" is not subject to an "automatic rule," "but each transaction must be adjudged on its own particular facts and in the light of the evil which Congress sought by the statute to prevent." In *Gold* the exchange of stock in a merger was held to be a "purchase" by one defendant, though not by other defendants.[20] The facts with respect to the defendant held liable under Section 16(b) came within the reach of *R.K.O., supra.* In that type of case an exchange on a merger can be a "purchase" as well as a "sale." But in a *Kern County* type of case it would make no sense to treat a transaction held not to be a "sale" to be a "purchase."

On the contrary, holding the exchange pursuant to merger to be a "purchase" would allow the successful party to lock in the defeated tender offeror for six months post-merger. That would act as a powerful deterrent on tender offers, many of which involve the payment of substantial interest to lending banks.

The District Court did not specifically rely on this contention of the appellee. It emphasized, rather, the matching of the purchase of Air Brake shares for cash and the sale for cash after the exchange pursuant to the merger of the Standard stock received on the exchange.

### III

We turn then to the District Court's determination that the cash sale by Crane of the *Standard Preference Stock* it acquired on the merger should be matched against its purchase of a different stock, *Air Brake Common* within six months of the sale. We have found no case in which the sale of the stock of the successor corporation was matched against the purchase of the stock of the acquired corporation to spell § 16(b) liability.[21] We must consider the decision below rendered in July, 1972 as one of first impression.[22]

Standard, in its amended complaint, fairly alleged the matching of the transactions mentioned as affording a claim for relief, and Crane adequately countered by defending on the ground, *inter alia,* that the § 16(b) claim did not, in any event, belong to plaintiff Standard. On this aspect of the case there is surely no factual dispute, and the issue is ready for summary judgment.

The issue is whether Section 16(b) permits a statutory liability to attach by matching the purchases of the shares of one "issuer" against the sale of shares of another "issuer."[23]

**20.** *Gold* did not involve a defensive merger, nor a "beneficial owner." It involved a voluntary merger in which the defendant held liable was the principal negotiator.

**21.** The decision below is said to be the first case so to hold. See Posner, Developments in Federal Securities Regulation, 29 Bus. Lawyer 3, 38 (1973).

**22.** Blau v. Oppenheim, 250 F.Supp. 881 (S.D. N.Y.1966) involved only a question of standing to sue. A stockholder of a successor corporation by merger was held to have standing to sue for recovery of profits of a director who purchased and sold, within six months, the stock of the acquired company. The successor corporation had succeeded to all the assets of the acquired corporation, including the § 16(b) claim. Judge Weinfeld held that its stockholders could sue in a direct action under § 16(b). *Oppenheim* was cited with approval by this court, but only on the question of standing. Newmark v. R.K.O.

General, Inc., *supra,* 425 F.2d at 352, n. 4. In Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 739–740 (1965), cert. denied, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966), the Eighth Circuit treated the question as one of survivability of the cause of action. The *Oppenheim* case has been construed by a commentator "as relating solely to the issue of standing and is of dubious precedential value for the conclusion that equity securities of different entities should be matched in order to invoke liability under the statute." Lang & Katz, Section 16(b) and Extraordinary Transactions, 49 Notre Dame Lawyer 705, 723 (1974).

**23.** For purposes of this discussion we assume, without deciding, that the immediate right of Crane to convert its preference shares into common requires the computation of its more than 10% beneficial ownership on the basis of a hypothetical conversion which would have made Crane a 15% holder of the issued

The appellant makes a number of other contentions as well. Appellant contends that § 16(b) does not apply to Crane's sale of Standard preference stock because that stock was at the time unregistered and exempted from § 16 of the Act and, alternatively, because the convertibility of the Standard preference stock did not confer on Crane the status of beneficial owner of Standard common. As an additional factor, it relies on the argument that, in the particular circumstances, Crane would have been unable to convert into Standard common because that would have involved a violation of the federal antitrust laws. Crane carries the antitrust point further by contending that its sale of the Standard stock was effected under antitrust compulsion which absolves it from § 16(b) liability.

Appellant contends as well that its sale of the Standard stock was a result of Standard's fraudulent market manipulation and that Standard should not be permitted to profit from its own wrongdoing.

We do not find it necessary to decide these issues in view of our disposition of the matter upon the grounds discussed in this opinion.

### The Statute

 Subdivisions (a) and (b) of Section 16 are grammatically interrelated and must, therefore, be read together for coherence. In pertinent part they provide:

"(a) Every person who is . . . the beneficial owner of more than 10 per centum of any class of any equity security . . . which is registered pursuant to section 78*l* of this title, . . . shall file . . . within ten days after he becomes such beneficial owner, . . . a statement with the Commission . . . of the amount of all equity securities *of such*

issuer of which he is the beneficial owner . . . .. (Emphasis supplied).

"(b) For the purpose of preventing the unfair use of information which may have been obtained by [such beneficial owner] by reason of his relationship *to the issuer*, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security *of such issuer* . . . within any period of less than six months . . . shall inure to and be recoverable *by the issuer* . . . .. Suit to recover such profit may be instituted . . . *by the issuer*, or by the owner of any security *of the issuer* . . . .." (Emphasis supplied).

Section 3(a)(8) of the Act defines "issuer" as "any person who issues or proposes to issue any security."

The statute speaks of "such issuer" in the singular. There is no room for a grammatical construction that would convert the singular into a plural. Nor does the internal construction of the section lend itself to such a free interpretation. For if the "issuer" is Air Brake, the insider profits "recoverable by the issuer" would not be the profits on the sale of its own stock but of the stock of a different "issuer"—Standard. If the "issuer" is Standard, "any profit realized by him from any purchase and sale . . . of any equity security *of such issuer*" does not cover the purchase of an equity security of another "issuer"—Air Brake.

The literal inapplicability of the statute was not involved when the claim was that the exchange on the merger was itself the "sale" for matching purposes. Newmark v. R.K.O. General, Inc., *supra*, for in such case the "equity security" purchased and sold was the same security, that of the original "issuer." Nor was it posed when the claim was that the exchange on the merger was itself the "purchase" for matching purposes

and outstanding Standard common stock. We note SEC Rule 16a–2(b) without passing on its applicability or validity. This is not to say, in any event, that a sale of the preferred stock is a "sale" of the underlying common.

We do not reach that question here. *Cf.* Chemical Fund v. Xerox Corp., *supra*; Simon v. Sunasco Co., Inc., CCH Fed.Sec.L.Rep. ¶ 92,547 (S.D.N.Y.1970).

with a subsequent sale, Gold v. Sloan, *supra,* for there too the matched securities are of the *same* "issuer", the successor corporation.

When, however, as here and in *Kern County, supra,* the exchange of stock on the merger is held to be neither a "sale" nor a "purchase" for Section 16(b) purposes, reliance must be had by Standard solely on the subsequent sale of Standard preferred shares matched against the earlier purchase of Air. Brake stock.

■■■ As applied to beneficial owners, as distinguished from officers and directors, § 16(b) provides:

> "This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of purchase and sale, or the sale and purchase of *the* security involved". (Emphasis supplied).

"Such" refers back to subsection (a) requiring the filing "of the amount of all equity securities of *such issuer* of which he is the beneficial owner." (Emphasis supplied). The style and substance lead to the conclusion that Congress was concerned with a single issuer.[24]

■■■ The literal meaning is that of beneficial ownership of the *same* security at the time of purchase and sale. While the statement of statutory purpose would not necessarily defeat a normal reading of the statute, cf. Smolowe v. Delendo Corp., 136 F.2d 231, 236 (2 Cir.), cert. denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943), the converse is not true when the statement supports the normal reading. The statutory purpose of § 16(b) is to prevent the abuse of inside information "by reason of his relationship to the issuer." At the time of purchase Crane had no relationship to Standard.

While the legislative history affords no explanation of the purpose of the proviso, the majority opinion in Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 424, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), suggests that "it may be that Congress regarded one with a long-term investment of more than 10% as more likely to have access to inside information than one who moves in and out of the 10% category. But whatever the rationale of the proviso, it cannot be disregarded simply on the ground that it may be inconsistent with our assessment of the 'wholesome purpose' of the Act."[25]

To consider the argument that "such issuer" may be construed to include a successor in interest by merger, several tools of interpretation, in addition to the grammatical reading, may be employed, such as 1) the judicial gloss on the statute by earlier judicial interpretation; 2) the legislative history; 3) the standards of statutory interpretation; 4) whether the statutory interpretation will in cases likely to arise serve as a good or bad precedent; and 5) the ease of statutory amendment if the Congressional views on policy differ from the judicial views.

1. In Abrams v. Occidental, *supra,* this court rejected the view that Section 16(b) should be mechanically applied "across the board, even to situations that Congress scarcely considered." 450 F.2d at 162. Judge Friendly (then Chief Judge) noted that we had been freed from the restrictive dictum of Park & Tilford, 160 F.2d 984, 987 by a series of cases beginning with the holding of Judge Stewart (as he then was) in Ferraiolo v. Newman, 259 F.2d 342, 346 (6 Cir. 1958) down through this court's consideration of the approach to § 16(b) in Blau v. Lamb, 363 F.2d 507 (2 Cir. 1966).

We shall not review all the cases that support, in the happy phrase of Judge Hastie, a "rule of reason"[26] in unorthodox transactions but we point to the culmination of the so-called "subjective approach" in *Kern County.*

---

24. This has been the view of commentators. See e. g., Note, 117 Pa.L.Rev. 1034, 1052 (1969), Lang and Katz, *supra,* 49 Notre Dame Lawyer at 721–24.

25. In *Reliance, supra,* the facts disclosed that Emerson was "forced" into its successive

"sales" by a defense merger. See Supreme Court, 1972 Term: Securities Regulation, 87 Harv.L.Rev. 291, 295, n. 29 (1973).

26. Hastie, J., dissenting in Heli-Coil Corp. v. Webster, 352 F.2d 156, 174 (3 Cir. 1965).

We note that Crane did not acquire a controlling interest in Standard, had no representation on Standard's Board of Directors, lacked sufficient voting power to elect a director and apparently had no intention of seeking such representation.

Examination of the possibility of abuse in the transaction to determine whether it should come within the automatic ban ascribed to § 16(b) by cases (in language at least) like Park & Tilford v. Schulte, *supra*, has thus far been limited to situations where there has been a "conversion" of securities rather than a purchase or sale for cash.

Such a nonobjective approach has been applied to exchanges involving securities of the same issuer, e. g., Blau v. Lamb, 363 F.2d 507 (2 Cir. 1966); and see Roberts v. Eaton, 212 F.2d 82, 83–86 (2 Cir. 1954), cert. denied, 384 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652 (1959); Petteys v. Butler, 367 F.2d 528 (8 Cir. 1966); as well as to the exchange of securities in a merger, Newmark v. R.K.O. General, Inc., *supra*; Abrams v. Occidental, *supra*, aff'd sub nom. *Kern County, supra*; Gold v. Sloan, *supra*.[27]

The reason why this broader approach has been limited to such cases is not hard to find. For if the matter upon examination turns out to be within the proper scope of § 16(b), the *exchange* of shares pursuant to the merger is itself found to be the "sale" matched against an earlier purchase for cash, as in *R.K.O., supra*; or the *exchange* is found to be the "purchase" matched against a subsequent sale *for cash* of the same security. Gold v. Sloan, *supra*.

In such cases the need to match the securities of different issuers could hardly arise, since one of the two requisite components—purchase or sale—would, by hypothesis, have been found to inhere in the *exchange* itself.

2. The legislative history of Section 16(b) of the 1934 Act has been studied by courts in many cases. See, e. g., *Kern County, supra*; Smolowe v. Delendo Corp., *supra* (Clark, J.); Blau v. Lamb, *supra*, Petteys v. Butler, *supra*.

The rather short legislative history of the present § 16(b)[28] indicates that this "anti-Wiggin statute"[29] as it was popularly called, dealt with the speculative practices of those captains of finance who had taken advantage of confidential inside information to trade in the securities of *their own* companies to the abuse of their own "outside stockholders." Congress was concerned about the "outside" owners of securities which were being cavalierly traded by fiduciaries whom the stockholders had elected to positions of trust. The stress was on fiduciary responsibility. The purpose of § 16(b) was to prevent directors, officers and principal stockholders "from speculating in the stock of the corporations to which they owed a fiduciary duty." S.Rep. No. 1455, 73rd Cong. 2d Sess. 68 (1934).[30] Congress imposed liability for his profits upon the statutorily presumed faithless trustee without proof of actual loss. The profits were to be restored to the presumptively aggrieved *cestui que trust*, the issuer of the securities. The prize could be given to no other, for an alternative would have required proof of actual injury. If the asset of the corpo-

27. "In 1966, the conversion problem largely became moot when the Commission adopted Rule 16b–9, which exempted from the operation of § 16(b) any acquisition or disposition involved in a conversion of one equity security into another of the same corporation. Thenceforth, the controversy would center upon merger situations, creating the necessity of reexamining the problem of volition." Weinstock, 29 Bus. Lawyer 1153, 1160 (1974).

28. In draft form it was early called § 15(b).

29. See Report of House Committee on Interstate and Foreign Commerce, 73rd Cong. 2d Sess. Report No. 1383 p. 13 (1934).

30. "The undoubted congressional intent in the enactment of § 16(b) was to discourage what was reasonably thought to be a widespread abuse of a fiduciary relationship." Judge Burger (now Chief Justice) in Adler v. Klawans, 267 F.2d 840, 844 (2 Cir. 1959). As Professor Loss notes, the "inure to" phrase in § 16(b) suggests the concept of a constructive trust. Loss, Securities Regulation, 1042 n. 17 (1961). See Cook and Feldman, Insider Trading Under the Securities Exchange Act, 66 Harv.L.Rev. 385, 408 (1953). See Munter, Section 16(b), 52 Corn.L.Q. 69–71 (1966).

ration—secret information—was improperly taken, the profits were to be restored to the *cestui*. See Judge Learned Hand in Gratz v. Claughton, 187 F.2d 46, 49–50 (2 Cir. 1951), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951).[31] The beneficial owner concept was intended simply to expand the class of putative fiduciaries. After hearings on stock market practices the Senate Banking and Currency Committee reported in 1934:

". . . Closely allied to this type of abuse was the unscrupulous employment of inside information by large stockholders who, while not directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others."[32]

The successor corporation in a merger is hardly the *cestui* who was wronged.[33] The stockholders of the acquired corporation, aside from the defendant, may have only a small interest in the equity of the surviving corporation. They would share only in a relatively small proportion in any recovery by the successor.[34]

While every § 16(b) recovery may be deemed to partake of windfall there is ample justification in legislative purpose for restoring the recaptured profit to the issuer itself. See SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2 Cir. 1971); Diamond v. Oreamuno, 24 N.Y.2d 494, 499, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969). There is nothing but sheer windfall, however, in handing it to the successor corporation.[35] That corporation was not in any relationship with Crane before the merger except that of competitor for control of Air Brake. Standard's determination of the ratio of exchange in a merger it controlled was of its own making in negotiation with Air Brake. If the purchases by Crane of Air Brake stock incidentally affected the number of Air Brake stockholders who ultimately voted for the merger, such activities were legal and hardly within the prohibitory scope of § 16(b). See *Kern County, supra,* 411 U.S. at 597–598, 93 S.Ct. 1736.

3. In the legislative history we have observed no omission by inadvertence. But even if there had been inadvertence, as Justice Brandeis wrote in another context, "[w]hat the Government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included in its scope." Iselin v. United States, 270 U.S. 245, 251, 46 S.Ct. 248, 250, 70 L.Ed. 566 (1926).

Appellees do not suggest that we rewrite the statute. That we cannot do. See Packard Motor Co. v. National Labor Relations Board, 330 U.S. 485, 492–493, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). As Mr. Justice Stewart said in *Reliance, supra,* ". . . we are not free to adopt a construction [of § 16(b)] that not only strains, but flatly contradicts, the words of the statute." 404 U.S. at 427, 92 S.Ct. at 601.

The appellee argues that "issuer" should be read as if it said "corporation" whatever to Air Brake before the merger. They could hardly be described as *cestuis* of Crane. *Per contra,* all the former stockholders of Air Brake, aside from Crane, owned approximately no more than 20% of the equity on the basis of a hypothetical conversion of all the preference shares.

---

31. In Judge Hand's words: ". . . § 16(b) in effect made 'beneficial owners' fiduciaries as directors and officers were anyway." 187 F.2d at 49.

32. Stock Exchange Practices, Report of Com. on Banking & Currency, S.Rep. No. 1455, 73d Cong., 2d Sess. (1934) 55.

33. See separate opinion of Winter, J., in Gold v. Sloan, 486 F.2d 340 at 355.

34. On the present appeal we deal with a situation where about two-thirds of the common stock of Standard after the merger was owned by persons who had no relationship

35. That is, except where recovery is based on assignment from the dissolved corporation of a § 16(b) claim already matured for which it is assumed some consideration will have been paid in the merger exchange. See, e. g., Reliance Electric Co. v. Emerson Electric Co., *supra.*

and that a successor in interest by operation of law thus comes within the term. The difficulty is that the term "issuer" was the term of art selected by the Congressional draftsmen because it relates to its own registered "equity securities." Section 16(b) is not a statute dealing with corporate assets whatever they may be. The functions of registration and reporting are meaningful only in relation to the specific "issuer."

 While a legal successor in interest, indeed, has standing to recover, it does so only as successor to a claim already matured, a chose in action of the acquired corporation. Cf. Western Auto Supply Co. v. Gamble-Skogmo, Inc., supra.

4. While we believe that our interpretation of the statute is compelled, we pause, nevertheless, to assess as best we can, its impact for the future. Although Section 16(b) is now forty years old, the precise question has never before been presented for decision nor is it likely to arise except in contested tender offer situations. When more than 10% of the subsequently acquired stock has been purchased within the six months before the effective date of the merger, and the tests of the *R.K.O.* decision have been met, there will be no problem, for the exchange itself will be the end rather than the beginning of the matching process. In mergers where the defendant is the opposing party in the contest for control and the test of *Kern County* is met, a sensible policy should permit the losing contender to divest itself of stock in the successor company, for it did not intend that company to be its investment vehicle. To make it hold on to the stock which it received in exchange would be to compel it to subject itself to the vagaries of the market, and probably to the continued payment of interest to a lending institution as a penalty for losing the contest for control. The enemy of yesterday is not the friendly insider of tomorrow. The enmity would hardly be dissolved by the merger unless some new deal were made for access to confidential secrets and control. A defensive merger may create a practical armistice but it is far short of being a treaty of peace.

We are satisfied, therefore, to hold as we do in this defensive merger situation, without fear of undesirable precedential effect.

5. While most, if not all, "beneficial owners" (other than those engaged in adversary contests for control) would be caught in the web of Section 16(b) simply by treating the *exchange* on the merger as a "sale" or a "purchase," there may be some other hypothetical situations that do not readily come to mind in which our reading of § 16(b) might not be in accord with the statutory purpose. It is better that any such hypothetical situations be covered by legislative action, whether it be by amendment of § 16(b) or in a new statute.

The proposed ALI Federal Securities Code, under the able guidance of Professor Louis Loss, has thus far in the draft statute not extended the *automatic* sanction of Section 16(b) to mergers. While the draft makes no mention of the "defensive merger" situation as such, it would add to present law a specific statutory provision permitting matching if the securities involved have "more than one issuer," § 1413(g), providing, however, that "if the defendant proves that he did not use information obtained by reason of his relationship to an involved issuer", he is relieved of liability under § 1413(h). This addition to existing statutory law, in any event, would not apply the irrebuttable presumption of the present Section 16(b) to such transactions involving "more than one issuer." [36]

There has, indeed, been some comment to the effect that "before the development of Rule 10b–5 there was a legitimate reason for expanding the coverage of § 16(b) and applying it flexibly, but that reason no longer exists. The 'possibility of abuse' test operates with no more certainty or simplicity than does Rule 10b–5; yet its application does not

---

**36.** ALI Federal Securities Code, Tentative Draft No. 2 (1973).

disclose actual inside speculation." Note, Reliance Electric and 16(b) Litigation: A Return to the Objective Approach, 58 Va.L.Rev. 907, 928 (1972). See also Lowenfels, Section 16(b): A New Trend in Regulating Insider Trading, 54 Corn.L. Rev. 45, 61–64 (1968).

Lastly, we note that the policy issue, of recent development, lends itself to legislative consideration. The stronger emphasis on the abuse of inside information for speculative purposes exemplified by SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2 Cir. 1968); 446 F.2d 1301 (2 Cir. 1971) coupled with the legislative concern with tender offers, Securities Exchange Act, § 14(d), 15 U.S.C. § 78n(d), Act of July 29, 1968, Sec. 3, 82 Stat. 456, added in the Williams Act, indicate that reliance on Section 16(b) as the key tool in merger situations may not necessarily be desirable. See Lowenfels, *supra*. It is Congress which can make any contrary policy decision.

For the foregoing reasons the order granting partial summary judgment against Crane is reversed, and the cause remanded with instructions to enter judgment dismissing the complaint.